BOB (A SLAVE) *vs.* THE STATE.

[INDICTMENT AGAINST SLAVE FOR ASSAULT WITH INTENT TO KILL WHITE PERSON.]

1. *Admission implied from silence.*—A slave being summoned to the presence of a company of white persons, among whom were his master and mistress, for the purpose of having his shoes compared with the measure of certain tracks supposed to have been made by the perpetrator of a crime whom they were endeavoring to discover; and several of the company exclaiming, when it appeared that there was a perfect correspondence between his shoes and the tracks, "that they were the shoes that made the tracks,"—*held,* that this exclamation, with the fact that the slave made no reply to it, was not admissible evidence against him, as an implied admission.

2. *Admissibility of slave's confessions.*—A slave, while in prison under a criminal charge, having been induced to make several confessions, by an implied promise that his master would sell him and not let him be hung, the fact that he was still kept in prison, and that these confessions were offered in evidence against him on his trial, is not sufficient to show that the influence of such inducements was entirely removed from his mind, so as to render a subsequent reiteration of the confession competent evidence against him on a second trial.

3. *Admissibility of part of confession or conversation.*—When the prisoner's confessions have been proved against him by the State, he has the right to prove the remainder of the conversation relating to the same subject; but he cannot move to exclude the evidence adduced by the prosecution, because the witness had stated "that he did not remain to hear the entire conversation."

4. *Charge on admissibility of confessions referring legal question to jury.*—A charge, instructing the jury, "that if the prisoner's confessions were extorted from him by any sort of fear or hope of favor, they must disregard such confessions," refers to the jury the decision of a legal question, and should, for that reason, be refused.

APPEAL from the Circuit Court of Choctaw.

Tried before the Hon. C. W. RAPIER.

THE prisoner in this case, who was a slave, was indicted for an assault with intent to kill one Thomas Curtis, a white person. The indictment was found at the March term, 1857, and a mistrial was had at the same term. A second trial was had at the March term, 1858, which resulted in a verdict of guilty, and consequent conviction and sentence of death. On this last trial, the fol-

lowing bill of exceptions was reserved in behalf of the
prisoner:

"On the trial, the State introduced Thomas Curtis as a
witness, a white person, who stated that, on the evening of
the 6th January, 1857, he left the house of his father,
Robert Curtis, which is about one mile and a half south of
Butler, the county-seat of said county, and about a half-
mile east of the public road leading from Butler to Bladon
Springs in said county; that he was at that time acting
as overseer for his father; that when he left home he in-
formed his father's negroes that he was going to the house
of Judge Joshua Morse, who resided in Butler, to an
oyster-supper; that he came to Butler, and remained there
until between 8 and 9 o'clock at night, when he started
for home; that as he was riding along the said public
road, about a half-mile south of Butler, some person who
was standing on the left side of said road, concealed in the
bushes, shot him with squirrel shot, several of the shot
taking effect in the left side of his head and face; and
that he soon recovered from the shock, and hastily pur-
sued his way home on his horse. Witnesses were intro-
duced by the State, who proved that, two or three hours
after the shooting, negro dogs were carried to the place
where said Curtis said he was shot; that they immediately
trailed off in the direction of his father's house, where the
tracks of some one, made only a few hours before, were
plainly discoverable. On the following morning, as some
of the negroes of said Robert Curtis were suspected of
being the perpetrators of the deed, Isaiah, one of said
negroes, was taken by some of the neighbors, assembled
for the purpose of ferreting out the offenders, to the place
along and over which the dogs had passed the night be-
fore. This was known to Bob, the prisoner. They then
returned immediately to the house, carrying with them
an exact measurement of the length and size of the said
tracks, when Bob and other negro men on the place were
called up, and the size of their feet and shoes compared
with the measure which had been taken. After nearly
all the negroes had been called up, and a comparison had
been made between said measure and their feet and shoes

respectively, Bob was called into his master's house, (it being now evening, and he being fully aware of what had been going on all day,) in the presence of his master and mistress, with several of the neighbors who had assembled, when the measure of the said tracks was applied to the shoes which he was at that time wearing. On applying the measure to Bob's shoes, it was found that it fit in every particular. Several of those present exclaimed, that they were the shoes that made the tracks; to which exclamations the prisoner made no reply. The prisoner's counsel objected to these exclamations of the bystanders going to the jury; but the court permitted them to go to the jury in connection with the evidence that the prisoner made no reply, and the prisoner's counsel excepted. It was proved, that the shoes of the prisoner were the shoes he had on the night before when he first made his appearance.

"The State introduced one Frisby as a witness, who testified, that the prisoner, in September, 1857, in his presence, made certain confessions to one Steadham and one Macdonald, tending to criminate himself. In opposition to the admission of these confessions as evidence to the jury, the prisoner, by his counsel, showed to the court the following state of facts: Soon after it was discovered that the shoes which Bob was wearing corresponded so well with the measurement which had been taken of the tracks in the field, Bob was taken out by Joshua Morse, a son-in-law of his master, and some of the other neighbors, and severely whipped, and afterwards salted, by pouring the salt upon the wounds made by the blows inflicted. On the next day, Bob was confined in the jail of the county, of which one McGehee was the jailor, who lived in the jail, and had charge of Bob by virtue of a commitment by a magistrate made on the 9th or 10th January. On the next day, or a day or two afterwards, while Bob was in prison, and in his cell, said McGehee approached him, and said, 'Bob, you are a fool; you had better confess your guilt; every body around here believes you are guilty; and you ought to know that it would be better for you to confess, and for your master to have

your value in his pocket, than for you to have your neck broke, and he have no money for you.' To this Bob made a confession of guilt, stating all the circumstances. A day or two after this, Joshua Morse and C. L. Watson, the sheriff, both of whom were present at the whipping given to Bob on the day after said Curtis was shot, and were active agents in all the proceedings had at the house of Robert Curtis after the shooting, up to the time of Bob's commitment, entered the prison, and approached Bob, with a leather strap made for the purpose of whipping negroes; and as soon as they entered, they ordered Bob to pull off his shirt and lie down. Bob thereupon immediately confessed that he was guilty of the offense of shooting said Curtis, and proceeded to state the facts connected with the same. Morse told him he wanted to hear none of his confessions, and then whipped him severely, without giving him any explanation as to the cause. At the trial at the March term, 1857, which resulted in a mistrial, all the prisoner's confessions made prior to that time were offered in evidence by the State, but, after argument by counsel, were excluded from the jury by the court. Some four weeks previous to the confessions made in the presence of the witness Frisby, Steadham, Frisby, said McGehee, and several other gentlemen, all (except McGehee) strangers to Bob, passed into the jail, with a white man committed under legal process, and passed so near the window of the cell in which Bob was confined, that he might easily have seen them, though there was no proof that he did see them; and they remained in and about the jail for some minutes. On the day of the confessions in the presence of Frisby; Steadham, or Macdonald, when all of them were standing at the window of Bob's cell, asked him, 'What in the h—l are you doing in here?' to which Bob replied, 'I was put in here for shooting my young master.' He was then asked if he did it, and replied, 'I did;' and on inquiry as to whom he belonged, he replied, 'Mr. Curtis.' On the next morning, the same three men again called at the window of Bob's cell, and on making inquiry of him as to his guilt, he denied that he was guilty of the crime

charged against him. It was proved that McGehee was not in the jail at the time Bob made confessions of guilt in the presence of said Frisby, but it was not shown that Bob knew he was absent. McGehee lived in the jail, and always attended persons there who had business. The court permitted the confessions made in Frisby's presence to go to the jury, against the objection of the prisoner's counsel, and, at the instance of his counsel, also permitted all the circumstances above detailed, which had been shown to the court on the part of defendant, and his denial of his guilt as above stated, to go to the jury, and left it to them to determine, in view of all the circumstances shown on the part of the defendant in opposition to the admission of said confessions, to what weight said confessions were entitled. The prisoner's counsel excepted to the ruling of the court admitting said confessions in evidence to the jury, and afterwards moved the court to exclude the testimony of Frisby from the jury, because the witness had stated that he did not remain to hear the entire conversation between Steadham and the defendant—that he had left them talking, but did not know what else had been said by the defendant; which motion the court overruled, and the prisoner, by his counsel, excepted. The confessions made in the presence of Frisby, were shown to have been made in September, 1857, about eight months after the confessions to McGehee.

"After the court had charged the jury generally, the prisoner's counsel asked the following charge : ' That if the confessions of the prisoner were extorted by any sort of fear or hope of favor, the jury must disregard such confessions :' which charge the court refused to give, and the prisoner excepted."

ROBERTS & McGOWAN, for the prisoner.

M. A. BALDWIN, Attorney-General, contra.

WALKER, J.—The master and mistress of the accused, their son, and several of the neighbors, were assembled in the house of the slave's master. The purpose of the

assembly was to compare the size of the feet and shoes of the master's slaves, with the measure of tracks which, as the evidence conduced to show, had been made by the perpetrator of the crime. The accused was called into the assembly, and the measure was applied to his shoes. There being a perfect correspondence between them, several of the assembly exclaimed, that they were the shoes of the person who made the tracks, and the accused was silent. Was the exclamation, with the ensuing silence of the accused, admissible evidence?

The implication of admissions from silence rests upon the idea of acquiescence. The maxim is, *"qui tacet, consentire videtur;"* and it never applies, unless an acquiescence in what is said can be presumed. Neither reason nor law will permit the presumption of acquiescence to be drawn from the silence, unless the circumstances were not only such as afforded the party an opportunity to act or speak, but such also as would properly and naturally call for some action or reply from men similarly situated. Fuller v. Dean, 31 Ala. 654; 1 Greenl. on Evidence, § 197; Gale v. Lincoln, 11 Vermont, 152; Mellen v. Andrews, 1 Moo. & Mal. 336. The exclamation was not addressed to the accused. It was made by white persons, in the presence of his master and mistress, and in a room of their house. It was rather an emotional expression, demanding no reply. Such an expression, made in such presence, by such persons, and in such a place, did not properly and naturally call for a reply from the accused slave. His social relation to his master and mistress, and to the other white persons present, forbidding the freedom of speech allowed among equals, and making a contradiction in most cases an insolence, rendered it unnatural, and, perhaps, improper, under the circumstances, for him to interpose a denial to the accusation implied in the expression which he heard. The habitude of thought and feeling, the consciousness of inferiority, and the subordination and discipline belonging to his condition, made it perfectly natural that he should be silent, because he did not feel authorized to speak, or from an apprehension that a contradiction would be deemed an impertinence.

The law prescribes that implication from silence must be drawn with great caution; and we should disregard that principle by holding the silence of the slave admissible as evidence from which an admission might be implied. We decide, therefore, that the court erred in the admission of the exclamation, and of the slave's silence.

[2.] A short time after the offense was committed, the accused was severely punished. A day or two afterwards, and in January, 1857, being in prison, he confessed his guilt to the jailor. This confession was procured by promise of favor, and was properly excluded. A day or two after the confession, when the slave, being still in prison, was about to receive further punishment from the same person who had previously punished him, he repeated his confession. This confession was also properly excluded from the jury, (if for no other reason) because the influence previously exerted upon him had not been removed. In March, 1857, the slave was tried, the confessions above named were offered in evidence against the slave, and, after argument, were excluded; and there was a mistrial. In the following September, the confession was repeated by the accused, who was still in prison, to a different person than those to whom the previous confessions had been made. This last confession was made, when the slave was accosted in rough language, and in the absence of any assurance that a change of the statement previously made would not be punished, or that the confession would not enure to his benefit. Did the court err in the admission of that confession in evidence, on the trial in the spring of 1858?

The law is, that after a confession is once obtained by promise of favor, no subsequent confessions of like character are evidence, unless it is shown that the influence has been totally removed; and, in case of slaves, the clearest proof is exacted.—Clarissa v. The State, 11 Ala. 57; Wyatt v. The State, 25 Ala. 9; Brister v. The State, 27 Ala. 107; Van Buren v. The State, 24 Mis. Rep. 512; Peter v. The State, 4 Sm. & M. 31; State v. Guild, 5 Hals. 163; Whar. Am. Crim. Law, § 695.

The only evidence, conducing to show that the influ-

ence by which the first confession was obtained had been removed, is that the slave was, after making that confession, retained in prison, and that the very confession, which he was first induced to make, was offered in evidence against him. That the accused was kept in jail after confessing, was a fact calculated to remove the impression that he would be benefited by the confession. But, in this case, it must be remembered, that the inducement to the confession was, that his master would sell him, and he would not be hung. At what time the slave was induced to believe he would be sold and extricated from his impending peril, does not appear. It seems to have been left indefinite. We cannot know what was the precise character of the hope and expectation generated in his mind, and that that hope and expectation did not continue to linger with him during the entire period of his imprisonment. When the slave had been assured by the jailor, who was his custodian, that it would be better for him to confess, and for his master to have his value in his pocket, than for him to have his neck broke, and his master have no money for him, who can say that an ignorant negro did not continue to indulge, throughout his imprisonment, the expectation that the time would yet come when the anticipation produced would be realized, and that he would not continue to indulge that expectation even to the gallows, unless he was informed that he had been deceived ?

The offer of the confessions in evidence, in his presence, would have been sufficient to have removed the impression from the mind of a white man, accustomed to, and understanding the proceedings upon a criminal trial. It might reasonably be presumed, that he would understand that his conviction and execution were sought upon the very confessions which he had been induced to believe would save him, and that he would thus be fully convinced of the impossibility of his receiving a benefit from making confessions. But we cannot affirm the same thing of a slave. An ignorant slave, knowing nothing of judicial proceedings, perhaps not even understanding the nature of the duties discharged by the different persons engaged

in his trial, and confused by the unaccustomed presence into which he was brought, and by the scenes transpiring around him, might witness an offer of testimony against him, and hear an argument upon its admissibility, without knowing that the testimony was really offered to procure his conviction. In the absence of any evidence showing that he understood that the very confessions, which he made from the expectation of favor, were offered and pressed as the means of his conviction and consequent execution, it would be difficult to decide that the impression had been totally removed.

There is another consideration affecting the question, whether the impression can be regarded as totally removed; that is, that a slave, who has once made a confession from the prospect of favor, may persist in the same statement, lest he might be punished for the change of his statements. This consideration is set forth in the previous decisions of this court, as a sufficient reason for the use of more caution in the admission of a slave's than of a freeman's subsequent confessions. Guided by all the reasons which we have given, we decide, that the court erred in the admission of the confessions upon the facts stated in the bill of exceptions.

[3.] The part of the conversation which the witness heard does not appear to have been in itself incomplete; and if further conversation on the same subject, favorable to the defendant, was had after the witness left, it was for the accused to have proved it.—Frank v. The State, 27 Ala. 37.

[4.] Whether the confessions were made through fear, or from the promise of favor, was a question affecting the admissibility of the testimony, and was for the court. If it should be discovered, at any time during the trial, that the confessions had been made under circumstances which rendered them inadmissible, it would be the duty of the court to exclude them. The charge asked by the defendant would have referred this question to the jury, and was, therefore, properly refused. It should be left to the jury to determine the weight and credence to which the testimony is entitled.

There is no other question in the case, which it is necessary for the guidance of the circuit court that we should decide.

The judgment of the court below is reversed, and the cause remanded.