Green *v.* State.

GREEN *v.* STATE.

(*Jackson.* June 16, 1896.)

1. MURDER. *Conviction upon circumstantial evidence sustained.*

  Conviction of murder in first degree upon circumstantial evidence is sustained upon the facts set out in the opinion. (*Post, pp. 52–59.*)

2. EVIDENCE. *Blood stains.*

  Evidence that stains, found recently after the murder, on the gloves of defendant, were produced by blood, is competent, although the witness is unable to state whether or not it is human blood. (*Post, pp. 58, 59.*)

3. SAME. *Admission and withdrawal of.*

  The admission of evidence which appears at the time to be competent and its withdrawal upon subsequent disclosures that render or are supposed to render it incompetent, accompanied by proper instructions to the jury to disregard it, affords no cause for reversal, even if the evidence was inadmissible (*Post, pp. 59–62.*)

4. SAME. *Confessions.*

  The admission of confessions made in defendant's presence, implicating him in the homicide for which he is on trial, which were not denied by him, is not cause for reversal, although defendant was, at the time, under arrest, when the jury were fully instructed as to the dangerous and unsatisfactory character of such evidence and as to the limited purposes for which they were permitted to consider it. (*Post, pp. 62–66.*)

  Case cited and approved: Queener *v.* Morrow, 1 Cold., 123.

5. CHARGE OF COURT. ` *Correct as to implied confessions.*

  Charge of Court as to confessions made in defendant's presence implicating him in the crime for which he is on trial, is correct, which admonishes the jury of the dangerous and unsatisfactory character of such evidence, and instructs them that

Green *v.* State.

it must affirmatively appear that defendant heard and fully understood such confessions; that he did not deny them; that they were such as reasonably called for denial by him; that the circumstances were such as admitted of denial and free action on his part, and that such confessions were not, even then, to be accepted as proof of the facts stated, but given such weight only as the jury deemed right. (*Post, pp. 62–67.*)

Cases cited and approved: 35 Ind., 317; 86 Ind., 104; 39 Am. R., 636; 37 N. Y., 303; 13 Abb. Pr., N. S., 209; 43 Col., 444; 108 Mass., 285, 464; 10 Ga., 511; 10 N. C., 377.

6. SAME. *Correction of.*

An erroneous statement of the law in the Court's charge, which is distinctly recalled and corrected in an additional instruction given at the request of a party, affords no cause for reversal. (*Post, pp. 68, 69.*)

7. WITNESS. *Confirmatory statement.*

Evidence that certain witnesses had made statements on the afternoon of the homicide for which defendant is on trial, in the latter's presence, to the effect that he had hidden the gun with which the deceased was killed, is admissible in confirmation of similar testimony given by them on the trial to support their credibility as witnesses, although defendant denies that such statements were made. (*Post, p. 69.*)

Case cited and approved: Queener *v.* Morrow, 1 Cold., 123.

8. CHANGE OF VENUE. *Absence of defendant.*

An objection, first made on appeal, that the venue of a trial for murder was changed, in the absence of defendant, on application of his counsel, is not available where defendant's presence at the motion for change of venue would have exposed him to mob violence, and there is nothing to show that he did not authorize the filing of the petition. (*Post, pp. 70, 71.*)

FROM MADISON.

Appeal from Criminal Court of Madison County. JOHN M. TAYLOR, J.

W. G. LYNN and A. W. STOVALL for Green.

Attorney-general PICKLE and E. L. BULLOCK for the State.

McALISTER, J.  The plaintiff in error was convicted in the Criminal Court of Madison County of the murder of one Miles Mitchell, and, from the sentence of death pronounced upon him, has appealed to this Court.

The crime was committed in the County of Hardeman, but, on account of the popular excitement prevailing there, the venue was changed to Madison County, with the result already announced.

The crime was one of peculiar atrocity, and, if the guilt of the prisoner has been established and his conviction secured in the manner prescribed by law, the judgment pronounced against him should be executed.  The conviction was rested largely upon circumstantial evidence, fully set forth in a voluminous record, which has been very carefully examined by the Court.  But, before entering upon a discussion of the evidence, the theory of the State in respect of the crime will be briefly outlined.

It is claimed by the State that the crime is the result of a conspiracy, entered into between the defendant, Bart Green, and another negro, one Moses Pirtle, to murder Miles Mitchell and rob him of a large sum of money which, it was thought, he carried upon his person.  Moses Pirtle was arrested as an accomplice in the crime, and, for protection

from mob violence, he and the defendant, Bart Green, were lodged in the jail at Nashville, where Moses Pirtle died prior to any trial.

Miles Mitchell, the victim of the crime, was accustomed to carry upon his person large sums of money in a leather pocketbook, which he deposited in his inside vest or coat pocket.

Moses Pirtle, the dead accomplice, had been employed the year preceding the murder upon Mitchell's farm, and had knowledge of the habit of Mitchell to carry large sums of money upon his person. It was also known to Pirtle that Mitchell was accustomed daily to go to his barn, at a very early hour, for the purpose of feeding his stock. At the date of the homicide, Moses Pirtle lived with his father, Rube Pirtle, whose house was about four hundred yards northeast of Mitchell's place. Bart Green, the prisoner at the bar, cultivated a small farm, known as the Kinnie place, situated about two miles north of the Mitchell farm and about one and one-half or one and three-quarters miles northwest of where Moses Pirtle lived. The murder was committed on Monday morning, December 16, 1895, before daylight, while Mitchell was in his barn in the act of feeding his stock, and the theory of the State is, that the fatal shot was fired by the defendant, Bart Green, who robbed the body, and buried seventy dollars of the money near a stump in the immediate vicinity, where it was subsequently found. It is not claimed by the State that Moses

Pirtle was present when the homicide was committed, but it is claimed that he actively participated in planning the murder, and that, in pursuance of said plan, he loaded the gun and set it outside his door, where it was found by Bart Green, and that Pirtle was to receive one-half of the money found upon the body.

With this brief outline of the State's theory, we proceed to notice the more prominent facts and circumstances supporting that theory and tending to incriminate the defendant. The body of Miles Mitchell was discovered by his wife, about seven o'clock in the morning, lying in a crib on the inside of a barn, situated on the premises, about one hundred yards from the house. The lantern, which the deceased had used in the early morning, was extinguished, and was hanging on the wall at the side of the crib, close to the door. The body was lying partially on its right side, with a large, lacerated gunshot wound in the left side of the head, tearing off a portion of the ear, lower jaw, and neck, severing the internal and external carotid artery, and producing, according to the medical experts, instant death. An examination of the wound showed that it had been inflicted, at close range, with birdshot, delivered from a gun, the newspaper wadding and some of the shot being extracted by the surgeon. The vest of the deceased indicated that it had been unbuttoned from the top, the lower button being still fastened, and within the inside vest pocket,

bloody stains or splotches were plainly discernible, tending to show that a bloody hand had been introduced into this pocket. A splotch of blood was also observed on the facing of the crib door—that is to say, on the right-hand side as one would leave the crib, going from the inside to the outside, and about a foot and a half from the bottom. In the language of the witness, this blood looked like a splotch and then a smear, about like a hand would make that had caught the facing.

The barn, within which this crib was built, was divided by a passageway, and the crib, where the body was found, was on the left-hand side of this passageway, at the rear end. The rear end of this hall or passageway was inclosed by a lattice door, through which, the witnesses say, a man entering the barn with a lighted lantern could be plainly seen.

An examination of the ground disclosed two tracks, apparently of a man that stood very near this lattice door, at the rear of the barn near this left-hand crib. Near this barn was a gate opening into an orchard, and through this orchard, across a ravine, and in the direction of Moses Pirtle's house, were distinctly outlined two sets of tracks—one set coming and the other going—but plainly made by the same person. The witnesses describe these tracks as a little careened and run down to the outside on both feet. A comparison was made on the day of the killing between these tracks and tracks which

Moses Pirtle was asked to make in some soft mud prepared for that purpose. Witnesses state that, while the track made by Moses Pirtle was of the same length, his track was perfectly straight and not careened or twisted. It was, however, shown by witnesses who examined Bart Green's premises on the day of the killing, that foot-tracks precisely similar to those leading away from the scene of the homicide were found in his garden and also in his cornfield, where the defendant admits he was at work that morning. It was shown that, shortly before the trial below, the defendant, Bart Green, while confined in jail, had on a pair of shoes which careened on both sides after the manner of the tracks, and he admitted that he had on these shoes when he left Whiteville, which was the day of the murder.

It was also shown in evidence that Bart Green was the owner of a gun, originally an army musket, but which had been bored for a shotgun, and that on Friday preceding the murder, this gun was taken to the house of Moses Pirtle. Bart Green and Moses Pirtle were in conference on Saturday, and by daylight Sunday morning Green was again at Moses Pirtle's house, and spent the entire day, leaving at a late hour in the evening. The theory of the State is, that the murder was committed with this gun, and that after the tragedy was enacted, Bart Green stealthily returned to the Pirtle place and concealed the gun in the smokehouse. On this point,

the evidence showed that about one o'clock on the day of the murder, bloodhounds were taken to the scene. They caught the trail at the orchard gate, near the barn, and followed it along the peculiar tracks already described, out into an open field, in a northeasterly direction, running about fifty yards northwest of the Pirtle house, when suddenly they turned, and, coming back, crossed over to the Pirtle premises, stopped behind the smokehouse and began to bark. This evidence was offered by the State in support of its theory that, after the assassination of Mitchell, Bart Green returned to the Pirtle premises and deposited the gun in the smokehouse. As further evidence of this fact, it was shown that, on the morning of the killing, between nine and ten o'clock, Bart Green again returned to the Pirtle premises, repaired to the smokehouse, procured the gun, and, after making an ineffectual effort to hide it in the stovepipe, carried it to a thicket northeast of the garden, and there concealed it in some sassafras bushes. It was found by a searching party in that thicket about four o'clock in the afternoon, and, upon examination, it was empty, as though recently discharged, with fresh powder burns on the tube and on the side of the barrel. There being some dirt in the muzzle, which prevented a proper inspection of the interior of the barrel, it was sawed in twain, and experts who examined it expressed the opinion that it had been recently fired.

When Bart Green was asked about the gun, he

denied having seen it, or any knowledge of its
whereabouts. While the party were searching for
the gun Bart Green was upon the premises, and sug-
gested that a pond, situated in an opposite direction
from the thicket, would be a good place to look
for it. This was before the defendant concealed the
gun in the thicket, and when the party dispersed
Bart Green went off with the Constable, ostensibly
for the purpose of going to the Mitchell place, but,
instead of doing so, upon becoming separated from
Constable Foote, Green immediately and hastily re-
turned to the Pirtle place, removed the gun from
the smokehouse, and concealed it in the thicket. The
evidence is indubitable that the gun in question was
the property of Bart Green, that he concealed it
in the thicket, and there can be no doubt that it
was the weapon with which the deed was perpe-
trated. Another inculpatory circumstance is to be
found in the fact that the defendant was the owner
of a pair of buckskin gloves, which, on Wednesday
succeeding the murder, were found in a tool box
upon his premises with every indication of having
been stained with blood. The proof is defendant
was accustomed to wear these gloves, and had them
on his hands Saturday and Sunday preceding the
murder, but when seen Monday he was without
them. When discovered on Wednesday the right
glove presented the appearance of having been scraped
on the inside of the palm and the inside of the
fingers. On the palm, across the fingers and at the

intersection of the thumb and forefinger, were stains which the witnesses testify were blood. It appears that two triangular-shaped pieces containing this discoloration were cut from the right-hand glove, and, having been saturated in a solution of chloride of sodium, were subjected to a microscopic examination by an expert in such matters, who pronounced it blood. This expert, however, did not undertake to state that it was human blood, saying it is impossible to distinguish between the blood of man and other mammals; as, for instance, the blood of a goat, dog, horse, or cow. He was very positive, however, that the stains were produced by blood. Such evidence, while not conclusive, was competent for the consideration of the jury, and, in connection with other facts and circumstances, may be cogent and convincing that the stains were from the blood of Miles Mitchell.

There were other incriminating circumstances of minor importance which we will not pause to consider, but pass to an examination of certain confessions made by Moses Pirtle, implicating the defendant, Bart Green, which it is alleged were illegal and incompetent.

The first confession was made on the Mitchell premises the afternoon of the killing, while Moses Pirtle and Bart Green were in custody, and in the presence of reputable witnesses. The prisoners were standing within six feet of each other, and the statement of Moses Pirtle was made in a tone of

voice that all present could hear. One witness re-
lates the confession, viz.: "Yes, I loaded the gun
and set it on the outside of the house, and Bart
Green came and got the gun and killed Mr. Mitchell.
Bart was to bury my half of it, and I have told
Mr. Montgomery and others, and have gone with
them and shown them where the money was."
Montgomery, in accordance with the information fur-
nished by Moses Pirtle, found seventy dollars in
money buried in the ground in a snuff bottle, in a
woods lot, about one hundred and twenty-six yards
northwest of Moses Pirtle's house.

It is also shown that, when this statement or con-
fession was made by Moses Pirtle, within hearing of
the defendant, Bart Green, that the latter did not open
his mouth or make any explanation. It was shown,
however, that within a few minutes after the state-
ment made by Moses Pirtle, Bart Green was taken
into the barn by the witness, Montgomery, and one
Henley, who tried to induce him to make a con-
fession, but Green refused to confess, and also de-
nied the statement made by Moses Pirtle.

Counsel for defendant objected to the statements
made by Moses Pirtle as incompetent, which objec-
tion was overruled, but thereafter the Court sus-
tained the objection, and instructed the jury, in
writing, as follows: "The Court has allowed testi-
mony to go to the jury as to a statement or state-
ments made by Moses Pirtle on the afternoon of
the day of the death of Miles Mitchell, which state-

ments were made in the Mitchell lot in the presence of the defendant, Bart Green. The evidence shows that Bart Green, shortly afterwards, in Mitchell's barn, denied the truthfulness of the statement. The Court holds that, for the latter reason, this testimony is incompetent, and, therefore, excludes the testimony, as well as the defendant's denial, from the jury, with instructions that it must not be considered for any purpose.''

Notwithstanding this evidence was withdrawn by the Court, with explicit instructions to the jury to disregard it, it is made the basis of an assignment of error in this Court. It is insisted that the evidence was incompetent, and the effect of permitting it to go to the jury was irremediable. If it be conceded that the testimony was, in fact, incompetent, as ruled by the trial Judge, it was only rendered incompetent by the denial of the defendant made subsequently in the barn. This denial was brought out on cross-examination. The Court cannot be expected to be endowed with any such preternatural prescience as to know what is coming on cross-examination. No denial of the statements of Moses Pirtle was made by defendant, Green, on the spot, but his denial was made afterwards, when he had separated from Pirtle, and was in the barn, and when there was time to reflect and to fabricate. Ordinarily, the value of such a denial is measured by the promptness with which it is made, and from the fact, also, that it is made in the presence of

the accuser. There is, at least, nothing in the action of the Court of which defendant can now complain. Exceptions were also taken to the proof of other confessions made by Moses Pirtle, and admitted under the following circumstances : On the evening of the day the murder was committed, the prisoners were taken from Whiteville to the jail at Bolivar. On the way, another negro came up, and, addressing the prisoners, said, viz.: "Didn't you boys know you would get caught when you killed Mr. Mitchell?" Moses Pirtle replied : "I didn't do it. I loaded the gun and set it out doors, and Uncle Bart killed him." This statement was made voluntarily by Moses Pirtle, without constraint or suggestion from the officers who had the prisoners in custody, and was admitted in evidence because made in the presence and within the hearing of the defendant, Bart Green, and was not denied by him.

Again, further along in the journey, Moses Pirtle became very weak, and, while the party stopped, one of the officers asked Moses Pirtle, "Why did you kill Mr. Mitchell?" He replied, "It's just like I said before; I set the gun out of the house and Uncle Bart killed him and put my money beside the stump." Bart Green was within ten feet when this remark was made, could have heard it, and made no reply. The record shows that a general exception was interposed by counsel for defendant to both of these statements, and the exception was noted,

but no ruling appears to have been made by the Court at that time.

The Court, in its charge, held that the two last confessions were admissible in evidence, because made in the presence of Bart Green, and no denial by him. The rule on this subject is thus laid down in *Queener* v. *Morrow*, 1 Cold., 123, viz.: "The general rule is, that an admission may be presumed, not only from the declaration of a party, but even from his acquiescence or silence. The force and effect of such an admission must, of course, depend upon the circumstances under which it is made. In some cases, if clearly proved, it will be evidence of the most convincing kind. In others it may be of very little force, and perhaps entitled to no consideration. And it is always to be borne in mind that it is the most dangerous kind of evidence. In order that a party may be affected by the statement of another on the ground of his implied admission of its truth by silent acquiescence, it must distinctly appear that he heard and fully understood such statement. The occasion must also have been such that the party sought to be affected was at liberty to interpose a denial of the statement, and he must not only have had the opportunity to speak, but the statement must have been · in respect to some matter directly affecting his rights, so as properly and naturally to demand a contradiction' if untrue." On this subject the Court charged the jury as follows:

"The Court has permitted evidence of certain declarations or statements of Moses Pirtle, made, as the State contends, in the presence and hearing of defendant, and implicating him in the crime, and to which the defendant made no denial. In the first place, it is incumbent on the State to show such statements were made, and made in the hearing and presence of defendant, and that he did not deny same. If this has been established by the State, . . . . then you will give such evidence such weight as it is fairly entitled to under the following instructions: Such evidence should be carefully and cautiously scrutinized by the jury, as it is considered of a dangerous character, and before any inference of an implied admission or acquiescence in the truthfulness of the statement can be drawn by the jury against defendant, it must appear affirmatively that the defendant heard and fully understood the statements; that they were made under such circumstances as afforded the defendant an opportunity to speak or act, or the circumstances did not naturally, properly, or reasonably call for a denial on his part, or the peculiar circumstances prevented a denial, you should not give any weight whatever to defendant's silence or failure to contradict the same. But if it appears that any such statements are proven, and defendant heard and understood the same and had the opportunity to act and speak, and the statement naturally and reasonably called for a denial on the part of the defendant, and were such

as reasonably permitted a denial, and he did not contradict or deny the same, then the jury may consider the same as proven for the purposes aforesaid, not as proof or evidence of the circumstances detailed in the statement, but to draw such inference as they think right.  It is a rule of law that when a prisoner is accused of crime and remains silent under the charge, such fact may go to the jury as a circumstance for such inference as it may reasonably warrant.  But acquiescence to a statement, to have the effect of an admission, must exhibit the same act of the mind and amount to voluntary demeanor or conduct of the party.  And where it is acquiescence in the conduct or language of others, it must plainly appear that such conduct was fully known and the language fully understood by the party before any inference can be drawn from his passiveness or silence.  The circumstances, too, must not only be such as afforded him an opportunity to act or to speak, but such, also, as would properly and naturally call for some action in reply from men similarly situated, and you, as jurors, should look to all the surroundings and circumstances confronting the prisoner, and his explanation of same.''

In view of the strong admonition delivered by the Court to the jury, in respect of the dangerous character of this evidence and the very circumscribed limits within which they are permitted to consider it at all, we are unable to perceive any error in

13 P—5

the admission of this testimony of which the `prisoner can complain.

Says Mr. Rice, in his work on Evidence, Vol. III., page 501, viz.: "Where an individual is charged with an offense, or declarations are made in his presence and hearing touching or affecting his guilt or innocence of an alleged crime, and he remains silent when it would be proper for him to speak, it is the province of a jury to interpret such silence and determine whether his silence was, under the circumstances, excused or explained. At most, silence, under such circumstances, is but an implied acquiescence in the truth of statements made by others. Still, it is a familiar elementary principle that silence, when the accused is under no restraint and at full liberty to speak, may sometimes be regarded as a tacit admission. At all events, all such matters are proper for the consideration of the jury." Citing *Pierce* v. *Goldsberry*, 35 Ind., 317; *Puell* v. *Beard*, 86 Ind., 104.

Says Mr. Wharton, Am. Cr. Law, Sec. 696, viz.: "Where a man, at full liberty to speak, and not in the course of judicial inquiry, is charged with a crime, and remains silent, that is, makes no denial of the accusation by word or gesture, his silence is a circumstance which may be left to the jury." See, also, Roscoe's Crim. Ev., 18; *Greenfield* v. *People*, 85 N. Y., 85 (S. C., 39 Am. Rep., 636).

The fact that a person charged with crime is under arrest, does not render what he says and does

inadmissible. *People* v. *Wentz*, 37 N. Y., 303; *People* v. *Montgomery*, 13 Abb. Pr., N. S., 209; *People* v. *Lory*, 43 Cal., 444; *Commonwealth* v. *Coffee*, 108 Mass., 285; *Commonwealth* v. *Croker*, 108 Mass., 464. Mr. Rice, in commenting on the case of *Commonwealth* v. *Kenney*, 12 Metc. (S. C., 46 Am. Dec., 672), says that case "does not conflict with the general principle, but suggests important limitations in its application and in the extent of its operation. If the statement is not heard by the accused, or if being heard, he deny it, or if circumstances existed at the moment which prevented a reply or rendered a reply inexpedient or improper, the evidence certainly is of no value."

It is admitted that such evidence should always be received with great caution. In some cases it may be equivocal and of the lightest possible value; in others, it may be entitled to much weight. Its value, of necessity, must be estimated by the jury. If it is doubtful whether the defendant heard or understood the proposition, to which his silent assent is claimed, the jury may determine it. *State* v. *Perkins*, 10 N. C., 377; *Berry* v. *State*, 10 Ga., 511; 2 Phillips' Ev., 194, note. The degree of credit due to such tacit admissions is to be estimated by the jury, under the circumstances of each case. 1 Greenl. on Ev., Sec. 215.

We think the instructions of the Court below were in accord with these authorities, and contain no reversible error.

The next assignment of error is based upon the following instruction submitted by the Court to the jury, to wit: "The statements of Mose Pirtle, as stated, have been permitted to go before you, and if he was, beyond a reasonable doubt, an accomplice with the defendant in the perpetration of the crime, you should receive his statements, as heretofore charged, and the circumstances under which they were made." The Court then proceeds to charge fully the law on the subject of an accomplice. It is conceded by the Attorney-general and the learned counsel representing the State, Mr. Bullock, that this instruction was erroneous, since Moses Pirtle did not testify in the case, but was dead at the date of the trial. The law, therefore, governing the testimony of an accomplice had no place in the case. The Court itself realized that this instruction was erroneous, and at the conclusion of the general charge, upon the request of counsel for the State, submitted, in lieu thereof, the following instruction, to wit:

"The Court, in its charge, has heretofore instructed the jury as to the evidence of an accomplice. Any statement of Moses Pirtle, allowed to go to the jury in this case, as being made in the presence of the defendant, cannot be received as evidence of the truthfulness or correctness of such statements. They are permitted to go to the jury as evidence alone for the purpose of considering whether they were made in the presence and hear-

ing of the defendant, under such circumstances and surroundings as would, under the charge heretofore given you, fairly and reasonably warrant any inference of an implied admission or acquiescence of the defendant by his silence, if shown, in the truthfulness or correctness of such statements, and you are charged that this last instruction must prevail over any instruction heretofore given you by the Court as to the evidence of an accomplice." We think the infirmity in the former instruction was cured by the charge subsequently given, which leaves no substantial basis for this assignment of error.

There was no error in admitting proof of statements made by the two women, Winnie Pirtle and Mattie Motley, in the presence of Bart Green, to the effect that he had hidden the gun. The two women were examined on the trial, and testified that defendant came to the Pirtle house on the morning the murder was committed, took the gun from the smokehouse, and hid it. There was no error in permitting other witnesses to state that these two witnesses had made similar statements on the afternoon of the killing, in their presence and that of defendant. The fact that defendant denied the statement at the time it was made would not render incompetent proof that these two women charged him with the act, since such evidence would be proof of previous confirmatory statements tending to support the credibility of the witnesses. *Queener* v. *Morrow*, 1 Cold., 123.

It is also assigned as error that the venue was changed from Hardeman County, where the crime was committed, to Madison County, upon the application of defendant's counsel, the defendant being absent and having not joined in the application or authorized it. The record shows that, on account of the public indignation aroused throughout the county of Hardeman, and the belief that the prisoner had some guilty complicity in the murder, it was necessary that he should be hastily removed from the county to escape mob violence. There is little doubt from this record—although a sad commentary upon our institutions—that, had the prisoner been returned to Hardeman County, he would have expiated his crime at the hands of a mob.

The trial Judge appointed reputable counsel to represent the prisoner, who, seeing the emergency, applied for a change of venue. The action of the trial Judge in promptly granting it is to be commended, since to have required the presence of the prisoner, would have exposed him to summary vengeance. The petition for a change of venue is signed and sworn to by J. H. Foster, attorney for defendant, and there is nothing to show that the defendant did not authorize the petition to be filed. Since the application and change of venue were manifestly for the benefit of the prisoner, and probably saved his life, he cannot be heard now to complain of the action of the Court. This is especially true, since no objection was interposed in the Court below,

and the question is made for the first time in this Court.

There is no merit in any of the assignments of error and they are all overruled. The defendant was examined as a witness in his own behalf, and told a story which was incredible and wholly disbelieved by the jury. The defense of an alibi, which he attempts to set up, we think is entirely overthrown by the proof. The defendant is shown by his neighbors to be a man of bad character and unworthy of belief. We think his guilt has been demonstrated upon this record beyond a reasonable doubt, and the judgment of the Criminal Court must be affirmed.