## STATE *vs.* MAX EPSTEIN.

### PROVIDENCE—APRIL 22, 1903.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Criminal Law. Evidence.*

The silence of a party while under arrest when charges or accusations are made against him cannot be used as sustaining the hypothesis of acquiescence therein.

(2) *Criminal Law. Evidence. Hearsay.*

*Semble,* that the evidence of police officers who interrogated deceased, through an interpreter, in the presence of defendant, as to what took place at time of the assault, and as to the responses made thereto through the interpreter, is inadmissible, as being hearsay testimony.

(3) *Criminal Law. Evidence. Res Gestæ.*

Rule in *State* v. *Murphy,* 16 R. I. 528, that "declarations shown by common experience to be the instinctive result from an act are part of the act, even if made five or fifteen minutes after the act," affirmed.

INDICTMENT, charging murder. Heard on petition of defendant for new trial, and petition granted.

TILLINGHAST, J. The defendant, who, on the 21st day of December, 1901, was convicted of the crime of murder, now petitions for a new trial on various grounds, amongst which are certain alleged erroneous rulings of the trial court in the admission and rejection of testimony.

The following statement will serve to show the relation and situation of the parties to the homicide in question shortly before and at the time when the fatal injury was inflicted, together with the substance and character of the testimony objected to.

On the night of July 26, 1901, the defendant, in company with Abraham Zarrinsky, the person whom the defendant is alleged to have murdered, went to the attic room where Zarrinsky lived, at No. 2 Bullfinch court, Providence, where they remained for a few minutes and then went together to the defendant's boarding-place. Finding the door locked, Zarrinsky invited defendant to return and lodge with him in his room, which invitation the defendant accepted. This room was in the attic of a two and a half story house, and was about fourteen feet in length and about twelve feet in width. The parties were fellow workmen, and were on friendly terms at this time. Zarrinsky had in his possession about two hundred dollars in money, which he carried in a bag on his person. When the parties entered Zarrinsky's room for the night, he locked the door, according to the testimony of the defendant, and put the key in his pocket. He then took two drinks from a bottle of alcohol, as the defendant testifies, and invited him to drink therefrom, but he declined. At about 2:30 o'clock on the next morning a man named Kwasha, who occupied the tenement beneath Zarrinsky's room, heard a noise in said room, and heard a call for help. He did not recognize the voice, but shortly afterwards Zarrinsky came down stairs and said that the defendant had taken his money and gone out. Kwasha then ran out and found the defendant lying on the ground, between the house and the fence, quite badly injured. His collar bone was fractured, he had a cut on his head, was bleeding from one ear, and appeared to be in great pain. During the combat in the room Zarrinsky was heard by some of the people below to cry out, "What are you licking me for; you have got my money!" And on being asked by Barnett Kwasha, from the window of the room below, what was the matter, Zarrinsky replied: "There is a murder up here; he is taking my money and is licking me." Shortly afterwards Zarrinsky brought down pieces of a broken bottle and said, in the presence of the defendant, who was then lying on the ground where he had fallen: "With this bottle he struck me." He also said that the defendant had taken his money, whereupon the defendant answered: "I ain't got the money." Zar-

rinsky was pale and had marks on his head, and the defendant, in addition to the injuries above specified, had an injury on his side.

Both parties were then taken into custody by the police, placed in the patrol wagon and taken to the police station, where the defendant was laid upon the floor and Zarrinsky was seated in a chair. Shortly afterwards, Dr. Griffin, the police surgeon, was called to the police station, where he examined the injured parties; and they were then removed to the Rhode Island Hospital, where Zarrinsky died, from the effects of the injuries received in said combat on the morning of July 28, 1901.

While the defendant and Zarrinsky were in the custody of the officers at the police station, Zarrinsky, in answer to questions propounded to him through an interpreter by the officers, in the presence of the defendant, made certain accusations against him, to most of which he made no reply; and the prosecution was permitted, against the defendant's objection, to prove the making of these accusations, together with the fact that the defendant made no reply thereto.

The principal accusations made by Zarrinsky, according to the interpretation thereof by someone who was present, were as follows: "He has got $90 in gold and $135 in bills." Zarrinsky told how Epstein came and asked him to take him up to sleep in his room, and that he did so, and that the defendant licked him and wanted to take his money. In answer to the question: "What did Mr. Epstein then say, if anything?" the witness answered: "The lieutenant questioned Mr. Epstein, and he said he was sick and could not answer him." In cross-examination counsel for defendant questioned the witness with relation to what took place at the police station, and the following information was adduced: "Q. Well, do you remember anything the defendant said at the police station? A. I remember Mr. Epstein saying 'Don't bother me, I am not able to answer you,'" This was said in Jewish; it was said to a man who was a Jew, and he translated it to the captain.

Lieutenant Edward O'Neill testified that the defendant was lying on the floor at the time of said conversation, and that he

appeared to be suffering.  Witness noticed blood oozing from
the left ear, and he appeared to be in pain.  "Q.  And his in-
juries seemed to take up most of his attention?  A.  I should
judge they did.  Q.  Who else were in the room?  A.  There
were quite a number, I don't know who they were; three or
four officers in uniform."  The officer further testified that
when he asked defendant where Zarrinsky's money was, he
replied:  "I am sick and I don't understand."  The officer
further testified that defendant had said nothing at all up to
that time in his presence; also that Zarrinsky said that he and
defendant went to bed together, and that subsequently he
waked up and found Epstein going through his pockets and
taking his money; that he (Zarrinsky) got up and called to him
to give up his money, whereupon Epstein struck him with a
bottle.  "He hit me on the head with the bottle, and he kill
me."  The officer asked him how much money he had, and he
told him that he had something over $200, he could not tell
the exact amount, but there were $90 in gold; there were ten-
dollar gold pieces, and there were twenty-dollar gold pieces.
The officer then asked Zarrinsky if he struck Epstein, and he
said "No, I want my money; he broke the bottle on my head
and jumped out of the window."  .  .  .  "I asked him what
Epstein did with the money?  He pointed out to me and said:
'He put it in that pocket.'  I went to Epstein's left pocket and
found a pocket-book which contained about $2 in silver.  Before
I said anything, Zarrinsky said: 'That is not mine.'  I looked
in the other pocket and found nothing."  The officer further
testified that he went to the room where the combat occurred,
and found the money-bag lying on the floor near the window
where the defendant went out; that he took this money to the
station, and Zarrinsky said it was his when he saw the bag.
The officer then asked defendant again what he did with Zar-
rinsky's money, and he replied:  "I am sick, I don't under-
stand."  Zarrinsky then stated again to the officer how Ep-
stein got out of the room; that he ran from him when he broke
the bottle on his head, and jumped out of the window; and that
to this latter statement Epstein replied that Zarrinsky pushed
him out, which statement Zarrinsky denied.  Dr. Clifford H.

Griffin gave his first attention to the defendant when he arrived at the police station on the morning of July 27th. He says: "I found Mr. Epstein lying on the floor of the room, with his feet towards the door and his head towards a man sitting in a chair, who was Zarrinsky. I first gave my attention to the man on the floor. I made an examination; he seemed to be in considerable pain, and in taking hold of his hand or arm to examine his pulse he complained of pain in his shoulder. . . . I found him bleeding from the nostrils and left ear; there was a fracture of the left clavicle; a lacerated wound of the left thumb; contusions about the left elbow, and an abrasion along the outer side of the left arm. He was conscious. Q. Did you talk with Mr. Epstein? A. Not more than to get his name and what is on this piece of paper. Q. Did he speak English? A. He said that he understood when I asked him his name and age. He seemed to speak with some difficulty." The doctor was then allowed to testify as to charges made by Zarrinsky against the defendant, who was lying on the floor, similar to those already detailed and testified to by the witnesses Kwasha and O'Neill. The statements testified to by the doctor as being uttered by Zarrinsky were the result of personal interrogatories put to Zarrinsky by Dr. Griffin in his capacity as a physician. He testified that he did not know whether Epstein heard the statements or not, and that he (witness) spoke through an interpreter. Other persons who were present at the police station when these various conversations were had with Zarrinsky were also permitted to testify as to the charges which he made against the defendant and as to the defendant's silence during most of said conversations.

Without further specifying in detail the particular language which was used by the police officers and others in interrogating Zarrinsky and in giving his replies thereto, it is sufficient to say that said interrogatories and answers substantially covered the entire transactions which took place between Zarrinsky and Epstein, as related by the former, from the time when they entered the attic room in question to the time when both the defendant and Zarrinsky were placed in the patrol wagon, after the combat in question, for the purpose of being carried

to the station. That is to say: Zarrinsky was freely interrogated by several persons, after arriving at the police station in company with the defendant, as to the acts which were committed by the latter according to the version thereof as given by Zarrinsky. The accusations thus made against the defendant were to the effect that he had robbed Zarrinsky of his money, that he had struck him on the head with a bottle, and had caused him all the physical injuries from which he was then suffering. And it appears that when most of these accusations were made the defendant remained silent.

The question raised is whether this testimony was admissible. The authorities bearing upon this question are not harmonious. One class of cases holds that the fact that the accused is in custody when the charges are made against him, while entitled to weight, will not of itself exclude such statements if the circumstances were such as properly called for a reply. Amongst the cases which take this view are *Kelley* v. *People,* 55 N. Y. 565; *State* v. *Murray,* 126 Mo. 611; *State* v. *Dillon,* 74 Ia. 653; *Green* v. *State,* 97 Tenn. 50; *Murphy* v. *State,* 36 O. St. 628. Greenleaf on Evidence seems to take the same view. See vol. 1. 16th ed. § 197.

The other class of cases holds that the silence of a party while under arrest, when charges or accusations are made against him, cannot be used as sustaining the hypothesis of acquiescence therein.

(1) We are of the opinion that the rule laid down in this class of cases is the more reasonable one, and we have therefore decided to follow it.

It is clearly the right and privilege of a party in such circumstances to remain silent; and the fact that he does so ought not to be allowed to raise any inference against him. The defendant in the case at bar, even if he heard and comprehended the import of the accusations made against him by Zarrinsky, which is certainly extremely doubtful, to say the least, was not called upon to reply to or contradict the same. *Com.* v. *McDermott,* 123 Mass. 440. Being in the custody of officers of the law, his silence practically ought to have no more effect as bearing upon his guilt than it would have had

if maintained by him while under examination in the District Court upon formal charges. In such a case it would be clear that he would not be bound to admit or deny what might be said by the witnesses, and that his failure so to do could not be considered as any admission of guilt.

Speaking of the effect of silence in the presence of statements made by third parties, Duncan, J., in delivering the opinion of the court in *Moore* v. *Smith*, 14 Serg. & R. p. 393, said:

"Nothing can be more dangerous than this kind of evidence. It should always be received with caution, and never ought to be, unless the evidence is of direct declarations of that kind which naturally call for contradiction; some assertion made to the man with respect to his right which, by his silence, he acquiesces in."

And it is to be noted that this language was used with regard to the effect of silence in a matter relating to a civil case.

A distinction is made between declarations made by a party interested and those made by a stranger. And it has been held that while that which one party declares to the other without contradiction is admissible in evidence, that which is said by a third person may not be so. "It may be impertinent," says Mr. Greenleaf in his work on evidence, volume 1, 16th edition, section 198, "and best rebuked by silence; but if it receives a reply, the reply is evidence. Therefore, what the magistrate before whom the assault and battery was investigated said to the parties was held inadmissible in a subsequent civil action for the same assault. If the declarations are those of third persons, the circumstances must be such as called on the party to interfere, or at least such as would not render it impertinent in him to do so."

In *Com.* v. *Kenney*, 12 Met. 235, the officer in custody of the defendant said, in his presence and hearing: "Here is a man that has been robbing a man." Shortly afterwards one Russell, the person named in the indictment as having been robbed, came in, crying, and said: "That man," pointing to the defendant, "has stolen my money." The defendant made no reply to these statements. At the trial of the case testimony

was admitted, against the defendant's objection, to the facts stated. In reviewing the action of the trial court it was held, in an opinion by Shaw, C. J., that the evidence in question was inadmissible. The court said: "The declaration made by the officer who first brought the defendant to the watch-house, he had certainly no occasion to reply to. The subsequent statement, if made in the hearing of the defendant (of which we think there was evidence), was made whilst he was under arrest and in the custody of persons having official authority. They were made by an excited, complaining party, to such officers, who were just putting him into confinement. If not strictly an official complaint to officers of the law, it was a proceeding very similar to it, and he might well suppose that he had no right to say anything until regularly called upon to answer."

In *Com.* v. *Walker et al.*, 13 Allen, 570, the district attorney called a police officer as a witness, who was allowed to testify, under objection, that while Carey, one of the defendants, was in a cell in the lockup, he went to the door of the cell with Mrs. Newhall, who was a witness for the prosecution, and pointed out Carey to her and, in his presence and hearing, asked her if she could identify him as the man who was with Walker, and she said "Yes;" that he asked her if she could swear to it, and she said "Yes." The defendant made no reply.

In sustaining the exceptions, Foster, J., in delivering the opinion of the court, said: "The testimony of the police officer to the conversation between himself and the witness, Mrs. Newhall, in the presence of the defendant while the latter was in custody, should not have been admitted. The defendant was not bound to deny or reply to the statements made between them, and his silence, under such circumstances, warranted no inference against him."

In *Bob* v. *The State*, 32 Ala. 560, Walker, J., in delivering the opinion of the court, said: "The implication of admissions from silence rests upon the idea of acquiescence. The maxim is '*qui tacet, consentire videtur;*' and it never applies unless an acquiescence in what is said can be presumed. Neither rea-

son nor law will permit the presumption of acquiescence to be drawn from the silence, unless the circumstances were not only such as afforded the party an opportunity to act or speak, but such also as would properly and naturally call for some action or reply from men similarly situated."

In *Gardner* v. *State*, 34 S. W. Rep. 945, (Texas) it was held that where a party is under arrest his silence cannot be used against him in a criminal case. Mr. Wharton, in his work on Criminal Evidence, 9th ed. § 680, takes the same view.

In *State* v. *Diskin*, 34 La. Ann. Rep. 919, it is held that mere silence while a party is held in custody under a criminal charge, affords no inference whatever of acquiescence in statements of others made in his presence. "He has the undoubted right," says the court, "to keep silence as to the crime with which he is charged, and is not called upon to reply to or contradict such statements. Under such circumstances it is held that the statements so made are not admissible against the prisoner, because they do not even tend to support the hypothesis of acquiescence."

To the same general effect are *State* v. *Young*, 99 Mo. 666; *State* v. *Howard*, 102 Mo. 142; *Rex* v. *Appleby*, 3 Starkie's Rep. 33; and *Child* v. *Grace*, 2 Carr. & P. Rep. 193. See also *State* v. *Ellwood*, 17 R. I. 763.

Even in those cases where it is held that evidence of a defendant's silence in the presence of charges made against him is admissible, the courts unanimously hold that it must plainly appear that the statements made were fully understood by the party before any inference can be drawn against him by reason of his silence. In the case at bar, therefore, we think most of the evidence in question would have to be excluded in any event. For it not only does not plainly appear that most of the language used at the police station by Zarrinsky and others was understood and appreciated by the defendant, but on the contrary we think it is very clear that he did not understand the same, and was not in a physical condition to enable him to understand it. He had jumped or fallen from the attic window referred to, to the ground, a distance of about twenty-five feet, where he lay, in a helpless condition and seriously injured, un-

til he was taken up bodily by the policemen and placed in the patrol wagon; and at the station he was laid upon the floor in a helpless condition, and was suffering severe pain from the injuries which he had sustained by the fall.

In view of all these facts we are clearly of the opinion that it was error to admit the testimony in question, except in so far as the accusations made were expressly replied to by the defendant. We are also of the opinion that it was error to admit the statements made in the presence of the defendant immediately after his fall from said window, except as to the one to which he made some reply. Such a fall must have left him in a dazed and semiconscious condition at the best; and it cannot be said with any show of reason that his silence while in such a condition, when charges or accusations were made against him, could be of the least weight in determining as to his guilt of the crime now charged against him.

(2)    Another, and what seems to us a fatal, objection to the admissibility of most of the testimony now under consideration (although this ground of objection was not taken by counsel) is that most of the statements or accusations made by Zarrinsky at the police station were made through an interpreter, and hence became mere hearsay when testified to at the trial. That is to say: The police officers interrogated Zarrinsky through an interpreter as to what took place at the attic room in question, and the responses which he made thereto were also given through the interpreter. In so far, therefore, as their testimony at the trial related to what Zarrinsky said in this way, it was clearly hearsay testimony; for they only knew what was in fact said by him from what the interpreter told them that he aid. See *State* v. *Terline*, 23 R. I. 530. The same objection also applies to what little was said by the defendant in reply to the accusations there made against him. He is a Russian, and had been in this country only about six months at the time of the homicide in question.

(3)    Whether any of the statements made by Zarrinsky at or about the time when the assault upon him is alleged to have been made were admissible as part of the *res gestœ*, we will

now consider. Defendant's counsel contend that they were not.

Most of said statements which were admitted as being part of the *res gestæ*, against the defendant's objection, were such as to fall within the rule as laid down by this court in *State* v. *Murphy*, 16 R. I. 528, with which rule we are content, and which we desire to re-affirm.

The statements now in question consisted of accusations which were evidently instinctively made by Zarrinsky during and immediately following the assault, and were such as to rebut all inference of calculation in making them.

We do not wish to be understood, however, as holding that what was said by Zarrinsky to the policeman and others, after he had returned to the attic room and dressed himself—it appearing that from fifteen minutes to half or three-fourths of an hour had elapsed between the time of the making of the assault and the making of such statements—would be admissible under the rule as above stated. For, as already intimated, it is only such statements as are immediately connected with the transaction and really form a part of it that can properly be said to be a part of the *res gestæ*. Moreover, as we infer from the record of the testimony, the statements made by Zarrinsky in the presence of the officers and others, while defendant lay upon the ground after falling from the attic window, were made in his native language; and, if our inference is correct, for the reason above suggested said statements could only be testified to, in any event, by such of those persons who were present and heard them as understood that language.

We have examined the numerous other exceptions taken by defendant's counsel at the trial, but do not find that any of them are tenable, or deserving of special consideration.

As there must be a new trial for the reasons above given, there is no occasion for us to determine whether the verdict is against the evidence.

New trial granted.

*Charles F. Stearns, Attorney-General,* for State.
*Francis I. McCanna and Thomas Z. Lee,* for defendant.