## JESSE O'QUINN v. THE STATE.

### No. 4112.   Decided December 9, 1908.

#### 1.—Theft of Hogs—Evidence—Declaration of Third Parties.

Where upon trial for theft of hogs two other parties were separately indicted for the same offense, testimony as to a conversation between these other parties and others, after the commission of the offense, and in the absence of the defendant was inadmissible in evidence.

#### 2.—Same—Evidence—Acts of Third Party.

Upon trial for theft of hogs testimony with reference to acts of third parties in the absence of the defendant was inadmissible.

#### 3.—Same—Evidence—Conspiracy—Declaration of Third Party.

Upon trial for theft of hogs it was error to admit in evidence the declaration of a third party to engage in the theft of the alleged owner's hogs, it not having been sufficiently shown that defendant heard this declaration and assented thereto, or that a conspiracy had been shown.

#### 4.—Same—Charge of Court—Response.

Where upon trial for theft of hogs it was not shown that a certain conversation between third parties to the effect that they would steal the hogs in question was heard by the defendant or assented to by him or whether the same was directed to him, it was error in the court's charge to assume as if it were an issue affirmed on one side and denied on the other, and that if such conversations reasonably called for some denial or reply by defendant that the jury could consider it.

#### 5.—Same—Charge of Court—Principals—Presence of Defendant.

Where upon trial for the theft of hogs, other parties were separately indicted for the same offense, and the theory of the State was that the defendant and his codefendants acted together in the commission of the offense, which the defendant denied on the witness stand, and the evidence was altogether circumstantial, and it was not shown that defendant was present at the taking or killing of the hogs, the court erred in giving the law on principals that if the parties were acting together on a previously formed understanding, then it was not necessary that defendant should be present at the taking of the hogs in order to constitute him a principal.

#### 6.—Same—Principal—Accomplice.

Upon trial for theft of hogs where others were separately charged for the same offense, and the theory of the State was that they all acted together, it was necessary to show, in order to make defendant a principal, that he was either keeping watch or doing something that the statute itself makes him a principal, or that he was present and assisted in the taking of the hogs. If he advised and encouraged or furnished means in advance he would be an accomplice but not a principal; nor would a subsequent connection with the stolen property make him such.

Appeal from the District Court of Angelina.   Tried below before the Hon. James I. Perkins.

Appeal from a conviction of theft of hogs; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*E. B. Robb* and *Geo. S. King,* for appellant.—On question of admitting declaration of third parties ·and codefendants:   Cases cited in opinion.   On question of principals:   Cases cited in opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of declarations of coconspirators: Blain v. State, 33 Texas Crim. Rep., 236.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of hog theft, his punishment being assessed at two years confinement in the penitentiary.

The record discloses that W. L. Thomas, the alleged owner, was a brother of John Thomas, and cousin of appellant and McClure, three of the parties supposed to be implicated in the alleged hog theft. The parties live in the same neighborhood, about fifteen miles east of Lufkin, the county site. On the morning of Saturday, about two o'clock, Hubbard testifies he and some friends were playing a game of cards "for fun" at his residence about four and one-half miles east of Lufkin. That he was attracted by the noise of his dogs, and going upon his gallery noticed passing along the public road a two-horse wagon with a couple of little black mules pulling it. With the wagon were the three above named parties and one Dan Sims. That he was about forty or fifty feet distant from the parties. The moon was shining, and he recognized the four, two of them being in the wagon, and two riding horseback. He also observed that the sideboards of the wagon were low, and in the wagon he noticed some dressed hogs with their feet sticking up. Somewhere about four or five o'clock in the morning, Gibbs, the owner of a meat market in Lufkin, testifies that he went to his market and found some or all of the above named parties at his market. It was remarked by some one of them that they had taken charge, and had brought the hogs they contracted him. He declined to take the hogs as he had made a contract with another party, and it seems that his "meat chopper" as he terms him, had made the contract for the purchase of these hogs without the witness' knowledge. The parties remarked that they would sell the hogs to some one else, and went away. The wagon with two of the parties in it, appellant being one, was seen returning along the public road in the direction of their home which, as before stated, was about fifteen miles east of Lufkin. They were seen by quite a number of witnesses traveling along the road, one of whom saw them at a lake where they stopped to feed their mules, and passed within fifteen or twenty feet of the wagon. Others saw them further down the road. Two or three of the witnesses testified that they looked in the wagon, and that one of them got out of the wagon a bottle of whisky and took a drink. None of these witnesses saw any hogs in the wagon on the return trip. Appellant took the stand in his own behalf, and stated that between 12 and 2 o'clock Saturday morning, Sims, Thomas and McClure came by his home and called him up and requested him to go to town with them. This he declined. An hour or so after they had passed, he did get up, saddle his horse,

and went to Lufkin. He stated that he was going to Lufkin that day any way to get medicine for his aunt. After he reached town he says he had nothing to do with the alleged codefendants nor the hogs. That after reaching town he hitched his horse at a rack, got his breakfast at a restaurant, and went around to the market where the other parties were, and there one of them requested him, appellant, to loan him his horse, and go back in the wagon until the borrower could overtake him. To this proposition appellant acceded, and did return in the wagon with one of the codefendants. After reaching somewhere in the neighborhood of three or four miles of home the party who borrowed his horse overtook him, and he, appellant, mounted his horse, and he and the other party riding horseback separated from those driving the wagon, he, appellant, going to his house to get some nails to fix his fish trap. He sustained this statement by other testimony. The sheriff followed the wagon to a point where it turned and went another direction, and looked about at that point to see if he could find any hogs but failed. There were others with him who also assisted in searching. They requested one James to assist in searching, but he either declined or did not accept at the time, but later during the day went to the point indicated and discovered where six dressed hogs were located about 160 or 170 yards from the road. Three of these were covered with slicker; the other three had brush pulled over them, and to use this witness' expression they were "In a rotting condition." W. L. Thomas, the alleged owner, took great interest in the case, and employed counsel to assist in the prosecution and offered a reward, or at least assisted in paying the reward for the discovery of the hogs. He testifies that he discovered at the Tom Arnold old place, evidence of where hogs had been killed and dressed, some hair, and blood, and an axe which had been used, he says, in knocking the hogs in the head. Somewhere on the Tom Arnold old place one of the defendants, Dan Sims, resided. Appellant, however, lived some distance away, two or three miles. Perhaps it is testified that the marks on the dead hogs had been changed, and there is considerable testimony as to whether the marks were changed after or before the death of the hogs. The changing of the marks is said to have occurred in the left ear. Thomas' mark in the left ear was a split and under bit. The mark had been so changed as to make it an under half crop. Some of the witnesses testify that the change did not entirely obliterate all evidence of the under bit mark. Appellant testified that he had nothing to do with the killing of the hogs, and knew nothing of it, and that on their return from town there were no hogs in the wagon, no witness located any hogs in the wagon on the return trip. No witness undertook to identify the hogs, in the wagon, that were carried to Lufkin. In fact, no one testified in regard to it one way or the other. Gibbs testified to seeing five or six hogs in the wagon but gave no description. The

wagon was an ordinary two-horse wagon. Some of the witnesses state it had low sideboards. One or two of them testified that it had no bed on it, but simply some planks laid so as to reach from the front to the hind axle of the wagon. There were two slickers in the wagon and an old quilt. Some of the State witnesses testify to seeing a box in the wagon twenty or thirty inches square about the height of the sideboards. One witness said he saw some meat in it but did not know whether it was hog meat or beef. None of them, however, locate the hogs in the wagon. This perhaps is a sufficient statement of the case to dispose of the questions involved in the assignments of error.

Watts, the sheriff, was permitted to testify that on the morning the parties were in the town of Lufkin he saw Charlie McClure and John Thomas, who are separately indicted for the same offense, in a restaurant in the town of Lufkin sitting near together and having a conversation personally in a confidential way. Appellant objected to this for various reasons. Among others, that appellant was not present, and the acts of McClure and Thomas were subsequent to the alleged commission of the offense, and not in the presence of appellant, and could not, therefore, be testimony against him. A colloquy then ensued between the court and counsel, which is recited in the bill. The court by way of qualification states that the bill does not set out the subject matter correctly, and refers to evidence on page 41 for correct statement as to how the matter occurred. Turning to that particular page of the statement of facts, we find that it recites, after giving the colloquy between the court and appellant's counsel, the following: Appellant's objection being overruled, witness answers as follows: "After I walked up in front of the market I then walked around to the front on Cotton Square somewhere about where the Stag restaurant is, and I was standing back against the dark wall and I saw Charley McClure and John Thomas in the restaurant; Charley and John had a little talk there, but, of course, I never heard it, and they came out and walked on down looking for their horses. B. F. Nerren was with me at that time and then I went back to Gibbs' market, and there was a horse standing there, and I went to see about the horse. It was Jesse O'Quinn's horse, and I went through the saddle pockets," etc. We are of opinion that the evidence objected to was not admissible. What was said between them was certainly not admissible against appellant. This, it seems, was after the parties had left the market and had separated, and appellant was not present.

The next bill recites the State was allowed to prove by the witness Henry Nerren that on the day of the return of the wagon from Lufkin, he was working between the town of Lufkin and the neighborhood in which defendant lived, and that some time during that day and shortly after he had seen a wagon pass where he was at work, driven by the defendant and Dan Sims, he saw two men

whom he took to be John Thomas and Charlie McClure riding horseback; that one of them was riding a gray horse, and the other a black horse; that they came within a short distance of where he was at work, and then quit the road, turned and went up the road that he usually traveled with his log wagon, as if they were going back towards camp; that they did not follow the wagon, but parted and went in different directions; that he saw them just as they turned and went into the brush, and could not see them any further. Various objections were urged to this. It may be stated that these two parties were two of the crowd that were in Lufkin and were riding out from Lufkin in the general direction of home on horseback. Appellant and Dan Sims had preceded them in the wagon. These were acts between parties in the absence of the defendant, and for which he was in no way responsible, and with which he had no connection, and were clearly inadmissible.

There are some other objections to similar testimony which we deem unnecessary to discuss in view of what has been said. The acts of the other parties, for the reason stated, would not be admissible.

Another bill of exceptions recites that, over appellant's objection, the State was permitted to prove by the State's witness James that about two months prior to the alleged taking of the property described in the indictment, he had a conversation with one John Thomas while they were digging potatoes. Appellant was assisting Thomas in digging the potatoes. In that conversation Thomas stated that his brother, William Thomas, the alleged injured party, had a number of hogs, but that he wanted too much for them, and proposed to the witness that they kill most of these hogs and use or sell them or do what they pleased with them, and the witness, thinking that Thomas was joking, asked him if he was in earnest, to which Thomas replied that he was, whereupon witness refused to engage in such undertaking. To the introduction of all this testimony appellant urged many objections. Among others, that it was not shown that appellant was present and heard the conversation, and in support of his objection, the following testimony was introduced, from this same witness, James: "Jesse O'Quinn was there on the place and part of the time we would be together and part of the time we would be separated. At the time we were talking about this matter, Jesse O'Quinn was not far away. I reckon he was in such a distance he could hear it. Jesse O'Quinn did not say much of anything. I don't know for certain that he said anything at all. He did not have but mighty little to say about it." The trial judge qualifies the bill by stating that he understood the defendant was present and heard the proposal to take the hogs and because his, the court's understanding of the evidence was that it showed a conspiracy between the defendant and Thomas and McClure and Sims to take the hogs, and if they did take them,

they took them in pursuance of such conspiracy and upon this ground also the above mentioned declaration by Thomas was admissible against defendant. It may be very seriously questioned that appellant heard the conversation between James and John Thomas. There is no evidence, as we understand it, nor does the bill undertake to show, nor the court's qualification, that there had been any conspiracy shown between the other parties to take William Thomas' hogs. The utmost that this testimony could prove was that John Thomas proposed to the witness James to engage with him in the theft of his brother Will's hogs. There is no evidence in the record anywhere of any conspiracy, unless it be deduced from the facts already stated, to wit: that the parties went to town together with some hogs. There is no evidence as to who killed the hogs that were said to have been cleaned at the Arnold old place, and if this evidence shows a conspiracy at all, it is deducible simply from the fact that the parties were together with some hogs which they carried to Lufkin for the purpose of selling to the butcher Gibbs. The conversation here referred to was two months prior to the taking of the hogs to Lufkin, and it is not shown that the hogs so carried belonged to William Thomas. The cogency of the conversation between John Thomas and James was simply that Thomas had in contemplation the taking of his brother's hogs, and desired James to engage in it with him. Appellant said nothing, and it is not sufficiently shown he understood what was going on or being said. Therefore, we do not think this testimony was admissible. There was a proposition to steal made by Thomas to James, which is declined. This was not a conspiracy. Nor do we believe that the evidence is sufficiently explicit to show that appellant heard this conversation to authorize it to be used against him as evidence, even had there been a conspiracy between Thomas and James shown by circumstances, under the authority of Sauls v. State, 30 Texas Crim. App., 496; Long v. State, 13 Texas Crim. App., 211; Fielder v. State, 23 Texas Crim. App., 477; Roquemore v. State, 50 Texas Crim. Rep., 542; Chapman v. State, 45 Texas Crim. Rep., 479. In Sauls' case, supra, Judge Hurt, delivering opinion of the court, uses this language: "Before the acquiescence of a defendant in the language or conduct of another can be assumed as the concession of the truth of any particular statement, it must clearly appear that the language was heard or the conduct understood by the defendant at the time (Long v. State, 13 Texas Crim. App., 211; Comm. v. Harvey, 1 Gray, 487); and we will add that the facts and circumstances must show beyond a reasonable doubt that the language was heard or the conduct understood by the defendant. This proposition is self-evident. Why? Because the conviction is certain, and therefore the facts upon which conviction rests should be certain beyond a reasonable doubt. If there is uncertainty as to whether the language was heard by defendant, this uncertainty

must of necessity enter into the verdict. Hence the importance of
having clear and unquestionable proof that defendant heard what was
said to him by his daughter. We are not informed as to the rela-
tive positions of the parties. Were they facing each other? What
was the distance between them? These are matters of the first
importance, especially when there is no reply by defendant." This
may well be reiterated under the facts of this case. If upon another
trial this testimony is sought to be introduced, it should be made
more certain that appellant heard what was said between the parties
at the time. Upon a proper showing this evidence would be ad-
missible. The witness intimates that appellant may have said some-
thing, but he was not certain of that fact. What did he say? Did he
decline like James to enter into it, or did he accede to the propo-
sition? These are matters of prime importance, and where appellant
is sought to be bound by what occurred between James and John
Thomas at the time, it must be shown that if he said anything it
was favorable to the conspiracy. We call attention also especially
to Long's case, supra, in this same connection.

The court gave the following as part of the charge to the jury:
"In reference to so much of the testimony of the witness James as re-
lates to declarations and statements of John Thomas to witness in
the nature of proposal to take William Thomas' hogs, you are in-
structed, that if you believe such declarations were made and that
defendant was present and heard them, yet you can not consider same
as evidence in the case unless you believe in the nature of such declara-
tions by Thomas and the circumstances under which they were made
were such as naturally and reasonably called for some denial, or
reply by defendant, if they were such as called for reply and defend-
ant hearing them made none, then you may consider same as evidence."
Various objections are urged to this charge. First, James testified
that this conversation occurred a month and a half or two months
before the alleged commission of the criminal act set up in the in-
dictment, and there was nothing for the defendant to deny. Second.
In arriving at their verdict the jury were authorized to consider
hearsay evidence against defendant, the charge telling them that if he
made no denial, the same could be considered against him as evi-
dence, and was a charge upon the weight of testimony. Third. It was
urged that it was not clearly shown that the defendant understood
himself to be accused of any criminal act committed, or that he
understood that it was being proposed that he was to commit any
criminal act. We think these objections are well taken. There is
evidence that possibly the appellant said something, though the
witness was not certain. If he did, did he object or advise against
it as did James? If he did, then, of course, he could not be held
as if endorsing what John Thomas said to James. The conversation
was not directed to appellant. He was not included in the con-
versation, nor included in the proposed taking of the hogs. If he

said anything, what did he say, and why should this be omitted from the charge, if the court saw proper to direct the jury in regard to this matter by the charge? The court treated this as if it was an issue affirmed on one side and denied on the other.

Again, the court charged the jury as follows: "All persons are principals who are guilty of acting together in the commission of an offense; so in this case if you believe from the evidence beyond a reasonable doubt that one or more hogs belonging to William Thomas were fraudulently taken as charged by the indictment, and that two or more persons acted together in such taking, and that the defendant was one of the persons so acting, then you will find that defendant is a principal in such offense and convict him as such. By acting together as above used is meant that the parties acted in concert and towards the accomplishment of the common purpose and object, one performing one part, and another another part, in aid of its accomplishment at the time of its perpetration; and if such acting together was in pursuance of a previously formed agreement and understanding to so take the hogs, then the actual bodily presence of the defendant at the time and place of the actual taking or killing of the hogs would not be necessary in order to make him a principal in the offense. But if there was no such previous agreement, then the defendant would not be a principal unless he was present at the original taking and knowing the unlawful intent with which the hogs were being taken, in some way participated in such taking, or, with such guilty knowledge, was present and advised or agreed to such taking before or at the time of its occurrence." Many objections are urged to this charge. Under the language employed by the court the jury were authorized to convict appellant if he was acting in concert towards the accomplishment of a common purpose. If he was performing one part and another another part in the aid of such accomplishment at the time of its perpetration, and if they were acting in this manner together in pursuance of a previously formed understanding to take the hogs, then it was not requisite or necessary, under this charge, that defendant should be present at the taking of the hogs in order to constitute him a principal. As we understand the law in this Stat, the contrary has been held by the decisions. A well considered case discussing this question is Dawson v. State, 38 Texas Crim. Rep., 50. On page 55 of this volume, Judge Henderson, speaking for the court, after citing Cook v. State, 14 Texas Crim. App., 96; Bean v. State, 17 Texas Crim. App., 61, says, quoting from the Bean case, as follows: "The dividing line between the two is the commencement of the commission of the principal offense. If the parties acted together in the commission of the offense, they are principals. If they agreed to commit the offense together, but did not act together in its commission, the one who actually committed it is the principal, while the other, who was not present at the commission, and who was not in any way

aiding in its commission, as by keeping watch, or by securing the safety or concealment of the principal, would be an accomplice. To constitute a principal, the offender must either be present where the crime is committed, or he must do some act during the time when the offense is being committed which connects him with the act of commission in some of the ways named in the statute. Where the acts committed occur prior to the commission of the principal offense, or subsequent thereto, and are independent of and disconnected with the actual commission of the principal offense, and no act is done by the party during the commission of the principal offense in aid thereof, such party is not a principal offender, but is an accomplice or an accessory, according to the facts." This definition was approved in the case of Smith v. State, 21 Texas Crim. App., 107. This case has been followed by a great number of decisions by this court. See Wright v. State, 40 Texas Crim. Rep., 45; Bell v. State, 39 Texas Crim. Rep., 677; Tittle v. State, 35 Texas Crim. Rep., 96; Gentry v. State, 24 Texas Crim. App., 478; Yates v. State, 37 Texas Crim. Rep., 347; 42 S. W., 296; Criner v. State, 41 Texas Crim. Rep., 290; Walton v. State, 41 Texas Crim. Rep., 454; 55 S. W., 566; McIver v. State, 37 S. W. Rep., 745; Fruger v. State, 50 Texas Crim. Rep., 621; McDonald v. State, 46 Texas Crim. Rep., 459; same case 80 S. W. Rep., 1013; McAlister v. State, 45 Texas Crim. Rep., 258. These, it would seem, are a sufficient number of cases to show the well settled law. In order to constitute appellant a principal in this particular case, he must have been present and assisted in taking the hogs, or he must have come within some of the statutory ingredients of either keeping watch or doing something that the statute itself makes him a principal. That he may have entered into a conspiracy to commit theft of the hogs with the other parties is not sufficient. If he advised them in advance to do so, and encouraged them and furnished means, he would be an accomplice, but not a principal, unless, as before stated, the evidence brought him within the definition made by the statute of what it takes to constitute a principal. His connection, subsequent to the taking of the hogs, if criminal, would not constitute him a principal, conceding they were Thomas' hogs. He would be in that event nothing more than a receiver of stolen property. We are not deciding that he would or would not have been such receiver under the facts. The point we are discussing is, that the evidence must show that he is a principal within the terms of the statute in order to justify the jury's conviction under the charge contained in the indictment. The court recognized by this charge the failure of the evidence to show that appellant was present at the time the hogs were taken or even killed, and predicates such charge upon the theory that there may have been a conspiracy between the parties to do the taking, and that appellant may have been doing something, though absent, in order to facilitate the other parties or assist in the general design

to take and get rid of the hogs. This is not authorized by the statute, and the criterion in the charge is, therefore, contrary to the provisions of the statute.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

RAMSEY, Judge.—I agree to the conclusion reached and that the case ought to be reversed. I am not prepared to agree to all the expressions contained in the opinion.