Arthur M. MUMPHREY, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–88–073 CR.

Court of Appeals of Texas, Beaumont.

June 22, 1989.

George E. Renneberg, Conroe, for appellant.

Thomas D. Glenn, Conroe, for State.

## OPINION

BROOKSHIRE, Justice.

The Appellant was convicted by a jury of the charge of aggravated sexual assault. After the case was tried to the jury on the guilt or innocent phase, and after the jury had returned a verdict of guilty, the parties then agreed to have the punishment assessed by the trial judge. The trial judge sentenced Appellant to 35 years in the Texas Department of Corrections. The sentence was pronounced on August 12, 1986. An out-of-time appeal was granted pursuant to a writ of habeas corpus proceeding filed by Mumphrey.

Appellant appeals on a single point of error, which is that the trial court erred in entering judgment of conviction for the aggravated sexual assault because the testimony of the accomplice witness was not corroborated. A startling episode took place in the trial. Apparently, the accused tried to influence or intimidate the accomplice witness Steve Thomas. The district judge and the jury observed this "theatre in the round" or "theatre in the pit" to use trial lawyer's jargon. A witness, Steve Thomas, was a defendant in a separate trial cause number arising out of the same criminal events for which the Appellant was convicted.

The indictment charged Mumphrey with intentionally and knowingly causing the sexual organ of a child, who was younger than 14 years of age, to contact the sexual organ of the accused, Mumphrey, and that Mumphrey did also then and there intentionally and knowingly cause the pen-

etration of the female sexual organ of the said child by the sexual organ of the defendant-Appellant.

There was one enhancement paragraph in the indictment setting forth that Mumphrey, on August 20, 1982, in the District Court of Montgomery County, and under the same name of Arthur M. Mumphrey, was convicted of a felony, being the burglary of a building. This conviction for the burglary of the building had become final prior to the commission of the principal offense which took place on or about February 28, 1986.

According to the record, this witness, Steve Thomas, admitted the rape of the complaining child witness in dramatic, disgusting detail. The gravamen of his testimony was that both he and the Appellant engaged in more than one act of sexual intercourse with a female who was then under the age of 14 years. In fact, the witness, Thomas, testified about repeated sexual acts, narrating his actions as well as the actions of the Appellant, Mumphrey.

The child of 13 years testified in the case that she was not the spouse of Arthur Merle Mumphrey. She clearly identified the Appellant in the courtroom as not being her spouse.

The complainant, herself, gave enough testimony to corroborate the accomplice witness. The complainant child was in the 7th grade when the offense took place. The complainant was walking at about 8 p.m., or later, down railroad tracks towards town and two males came up behind her. She testified that they were black and they just kept walking behind her for awhile. She could smell the odor of marihuana on the clothes of the men. She did not look directly into their faces. She testified that they made some uncomplimentary remarks to her and she became upset. She testified that one of the men was about a foot taller than she was. Then, they physically picked her up, taking her down a path into a wooded area.

One of the men started taking off the complainant's pants. The other one, she testified, had a knife to her throat and the holder of the knife said that he was going to kill the complainant. She actually felt the knife on her throat. She then testified that, first, one of them had sex with her. Then, the other one also had sex with the complainant. The complainant then testified that each had said that they wanted to have sex with her "dog style".

During this period of time, the complainant testified that there were some people walking down the tracks and the assaulters told the complainant that they would kill her if she screamed or said anything. The rapes were repeated.

After the several sexual assaults, the child was released and her dad located her and took her to the hospital emergency room. At the hospital, a nurse examined her, using a rape kit. The attendants drew blood. They gave her shots. They scraped everything from under the complainant's fingernails. She was examined by a gynecologist. She had to undergo a complete vaginal examination, as well as an anal examination. She was interviewed by several police officers, the same night, at the hospital.

The complainant was not able to say, at trial, that the defendant was one of the assaulters. On cross-examination, the complainant said that she never did look either one of them in the face.

A doctor who specialized in gynecology and endocrinology examined the child. He found multiple abrasions that appeared fresh. The medical specialist conducted a pelvic examination. The complainant had gravel, leaves and small twigs between her legs, in the crease between her buttocks and in between her labia. These foreign matters were in the labial crease, which the doctor defined as the opening to the vagina. The doctor testified that the young complainant was upset and distraught, but she was coherent. These objective findings were consistent with the physical nature of the ground and surrounding area of the locale of the rapes.

Steve Thomas, who was a co-defendant, agreed to testify about the facts in exchange for a 15–year sentence. The State of Texas offered the sentence in exchange

for Thomas' truthful testimony. Thomas' testimony, concerning the multiple rapings of the complainant, was consistent with the victim's testimony. Thomas further stated that it was the Appellant who wielded the knife and threatened to kill the 13 year old. The child swore a knife had threatened her throat.

Prior to the rapes, Thomas had met the Appellant near the railroad tracks on the evening in question, Thomas stating that the Appellant had been drinking wine— "Night Train" wine. Thomas also stated that they had smoked some marihuana. Later, Thomas said that Mumphrey did not smoke any weed at that time. Mumphrey did not use cocaine on the night in question, but Steve Thomas did, according to the record. Steve Thomas then testified that Mumphrey pulled a knife on the girl and took her down a steep trail. Then, Thomas said, Mumphrey took the child's clothes off and then Mumphrey took his own clothes off and that was when the first sexual assault took place—Mumphrey instructing or telling Thomas to watch. Thomas unequivocally testified that Mumphrey had sexual intercourse with the complainant more than once. The complainant was crying at the time these assaults were taking place.

A witness, Shannon Smith, totally disassociated with the offense, testified that he saw the Appellant and Steve Thomas at approximately 11:30 P.M., February 28, 1986—the night in question. He was sure that the two were Steve Thomas and the Appellant, Mumphrey. Steve was doing the talking when the three met. The witness thought both Thomas and the Appellant were intoxicated or appeared to be and Steve said they had just got this little girl and they had voluntarily had sex with the complainant and the complainant went to a school identified as Travis School. Steve was doing the talking and Mumphrey was about four feet from Shannon Smith. Shannon Smith testified further that Appellant said nothing and did not make any statement denying the narrative that Steve was revealing. This conversation took place the same night of the sexual assaults and at a nearby location.

After receiving treatment in the emergency room, the complainant led certain officers of the Conroe Police Department to the trail leading to the woods where the rapes occurred. At the locale of the rapes, an officer named Roberts recovered her shoes as well as a "Night Train" wine bottle that still had some drops of wine in it. Thomas had testified that when he first saw Mumphrey, Mumphrey had been drinking "Night Train" wine. Furthermore, the testimony of Shannon Smith places the Appellant, with his accomplice, in the vicinity of the offense shortly after the offense occurred. *Deas v. State*, 531 S.W.2d 810 (Tex.Crim.App.1976).

The complainant testified that her attackers offered her an alcoholic beverage. The empty "Night Train" wine bottle was found at the scene of the rapes within a few hours after the attacks. Partial fingerprints were taken from the wine bottle but were not conclusive; they did not eliminate the Appellant. Furthermore, Shannon Smith testified that, shortly after the rapes, Steve and the Appellant were encountered by him. Smith swore that Thomas proceeded to relate, in detail, how he and the Appellant had had sex with the little girl. The Appellant stood within four feet of the others and made no attempt to deny or refute that he had just engaged in committing the sexual assaults. This type of silence, under these facts, is equivalent to a tacit admission that he was, in fact, an actor and responsible for the sexual assault on the thirteen year old. It simply stands to reason that a person so accused of such an assault would not remain silent while being implicated in a serious felony offense such as aggravated sexual assault.

■ Where a statement or remark is made in a defendant's presence, that he heard and understood and which statement called for a reply or a denial, then his silence or acquiescence may be shown as an admissible fact having probative value; and his silence or acquiescence may even be shown as in the nature of a confession on his part where that same defendant is not under arrest. *Crestfield v. State*, 471

S.W.2d 50 (Tex.Crim.App.1971); *Smith v. State,* 635 S.W.2d 591 (Tex App.—Dallas 1982, no pet.). The rulings in *Crestfield, supra* and *Smith, supra,* apply here in Mumphrey's case because of the fact that the statements and remarks were made in his presence and they were adverse to his interests and they inculpated him, definitely calling for a denial or, at least, a reply. Mumphrey must have understood that he was being directly implicated in the commission of a rape or rapes.

■ The accumulated probative force of the testimony and evidence outlined above tends to connect the Appellant with the offense and is sufficient to corroborate the testimony of the accomplice, Steve Thomas. The necessary corroboration is additionally enhanced by the acts and demeanor of the Appellant at the trial; these important acts were observed by the jury and the district judge. We conclude that the testimony of the child and the testimony of the officers, the investigator, the physician, the physical nature of the locale, the real evidence found at the locale, the silence of Mumphrey—all of which when considered and weighed by the jury—corroborate the testimony of Steve Thomas. We affirm the jury's verdict.

Appellant was a secreter O type. The vaginal test did not rule out the Appellant as a suspect. Another factor was that, when the complainant and the police returned to the scene, the officers found her shoes that had been taken off during the numerous rapes. The scene of the rapes was consistent with and corroborated Thomas' testimony. Finding of the "Night Train" wine bottle, the finding that Mumphrey was a secreter O type, the testimony of Shannon Smith, Mumphrey's silence, the physical facts at the scene of the rapes, and Mumphrey's demeanor at trial, we decide, taken together and cumulatively, are amply sufficient to comply with *TEX. CODE CRIM.PROC.ANN. art. 38.14* (Vernon 1979). These various condemning parts of the evidence tend to connect Mumphrey with the offenses committed; they do not disconnect or disassociate the Appellant with this series of rapes and the attempted dog fashion anal intercourse. All of these corroborating strains of evidence certainly are consistent with a narrative as unfolded by the thirteen year old child as well as the State's other witnesses.

■ When an intermediate court of appeals is called upon to review the sufficiency of the evidence sustaining a conviction, we are to use the following standard which is: whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt; the evidence must be viewed in the light that is most favorable to the verdict of guilty. *Lincecum v. State,* 736 S.W.2d 673 (Tex. Crim.App.1987), *cert. denied* — U.S. ——, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988). Moreover, the correct test or criteria for determining whether the evidence and testimony sufficiently corroborates an accomplice's testimony is whether the evidence tends to connect the accused on trial with the offense committed rather than whether the evidence, taken as a whole, makes the accomplice's testimony more likely than not. Indeed, the correct and only standard is the statutory standard of: "evidence tending to connect the defendant with the offense committed" test. *Reed v. State,* 744 S.W.2d 112 (Tex.Crim.App.1988). We must review and consider all of the non-accomplice testimony and non-accomplice evidence as a whole in deciding whether there exists sufficient corroborating evidence and testimony to support and sustain the accomplice's testimony and the jury's verdict of guilty.

■ Stated in other words, the test concerning and governing the sufficiency of the corroboration evidence is to eliminate from our appellate consideration the evidence of the accomplice witness and then to proceed to examine the evidence and testimony of the other witnesses as well as the real or demonstrative evidence including the physical details of the scene of the offense with the view in mind to ascertain if there exists inculpatory evidence; that is, evidence of an incriminating character which tends to connect the defendant on trial with the commission of the offense. And if there is such probative

evidence, then the corroboration is sufficient. All the facts, circumstances and physical evidence which are in the record may be looked to as furnishing and supplying the necessary corroboration. The corroborative evidence may be circumstantial or direct or may be real or demonstrative evidence. It is not necessary that the corroborative evidence be sufficient in and of itself to establish the guilt of the accused. *Sometimes seemingly insignificant circumstances afford very satisfactory evidence of guilt of the accused and corroboration of the accomplice's testimony. And, of course, each individual record of each case must be considered on its own facts and the totality of its own circumstances. The presence of a defendant at or near the locale of the crime with the accomplice witness may, when coupled with other circumstances, be sufficient to corroborate the testimony of the accomplice witness. Moreover, the corroboration evidence need not necessarily directly link the accused to the crime or offense charged.* Mitchell v. State, 650 S.W.2d 801 (Tex.Crim.App.1983), *cert. denied* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221, reh. denied 465 U.S. 1074, 104 S.Ct. 1431, 79 L.E.2d 755 (1984).

Bearing in mind the holdings and rulings in the last cases cited, we have concluded that there exists sufficient and adequate corroboration and that the record before us sustains the verdict of guilty as well as the judgment and sentence below; all of which are affirmed.

The dissent criticizes the Court's opinion concerning the nature of the episode that took place in the trial before the jury when Steve Thomas was testifying.

The trial court stated to Mumphrey that the court saw Mumphrey shaking his head no. A fair reading of the record certainly leads to the conclusion that the trial court thought that Mumphrey was trying to influence either the witness, Thomas, or, more importantly, the jury, without taking the stand. We have not seen an exchange or dialogue such as this in any other criminal record. But Mumphrey acknowledged his actions that (referring to Steve Thomas) "[W]hat he's saying, it ain't true ..."

The dissent states that consensual, sexual contact with a small, white girl is not necessarily a penal offense. The record proves that the small, white girl was 13 years of age and that Thomas was 18 years of age. The statement that consensual, sexual contact with a small girl is not necessarily a penal offense, under this record, is inappropriate.

Furthermore, the record shows that the Appellant, according to the crucial witness, Smith, was only 4 feet away from Smith. Smith repeated this fact at least 3 times. Smith clearly identified the person that heard his statement and Steve Thomas' statement as being Arthur Merle Mumphrey instead of one of his brothers. Smith certainly further testified that Steve Thomas was talking in a regular conversational voice. Smith further said that he was quite sure Arthur Merle Mumphrey, the Appellant, heard the conversation that night because he was standing close enough. In any event, that testimony was to be weighed by the jury. The dissent proclaims that the court's opinion is overreaching. Not so. It was the jury's verdict of guilty that determined the matter. The dissenter overreaches and overthrows the jury verdict.

Moreover, the record clearly reflects that Charles Mumphrey was at least 15 or 16 years of age and was the younger, juvenile brother of Arthur Merle Mumphrey. An early stratagem engaged in was that Charles, being a juvenile, was to go to the Conroe Police Department and tell the police that he, Charles, committed the assault against the small girl. Charles told the police about the offense. The police then told Charles that he did not know enough about it *and, furthermore, that Charles was taking the rap for Arthur Merle Mumphrey.* Charles testified to these facts and affirmed them before the jury. The police also mentioned and explained perjury and that Charles could get 2 to 5 years imprisonment for perjury.

At this point, Charles admitted that he was lying about his participation in the sexual assault. By Charles' own admis-

sions, from the witness stand, he stated that he broke down and cried and then told the truth to the police. *Charles testified about a statement in which he indicated that he was trying to take the rap for Merle (Arthur Merle) so he, Merle, would not go to the pen. Charles's testimony was ample corroboration.* Reasonable, logical and deducible inferences from this evidence could be considered and weighed by the jury.

The enhancement paragraph in the indictment set forth that on August 20, 1982, in the 221st District Court of Montgomery County, Arthur M. Mumphrey, under the name of Arthur M. Mumphrey, was convicted of a felony, being burglary of a building. In August, 1982, the Appellant was tried as an adult and that conviction had become final prior to the commission of the tried offense of aggravated sexual assault.

The judgment herein reflects that the trial court heard evidence relative to the question of punishment and found that the enhancement paragraph of the indictment was true. The record reflects that on August 12, 1986, a punishment hearing was held. The punishment trial was to the Bench. *The defendant, Appellant here, pleaded true to the enhancement paragraph concerning the August 20, 1982, conviction.*

Interesting and significant it is to note that Steve Thomas talked about, and described, the sexual assaults in the actual presence of Appellant who made no denial—not even any response. Thomas also made an offer, of sorts, to Smith to apparently make available the 13 year old child for sexual purposes which Smith, to his credit, immediately refused and decried the offer. Still, Appellant said nothing.

Without objection, Charles Mumphrey, the juvenile, testified that he had previously given a statement in which he admitted that he was trying to take the rap for his older brother, the Appellant herein, so that Arthur Merle Mumphrey would not go to the pen. An entirely reasonable inference from Charles Mumphrey's sworn testimony is that he had grounds and reasons to believe that Appellant was in danger of having to go to the penitentiary because of the Appellant's involvement with the 13 year old girl.

The dissenter, with this entire record before him, writes: "[T]he conviction should be reversed and an acquittal ordered." But we affirm.

The dissent cites *Walker v. State*, 94 Tex.Crim. 567, 252 S.W. 554 (1923); *Paulus v. State*, 633 S.W.2d 827 (Tex.Crim.App. 1981) and *Walker v. State*, 615 S.W.2d 728 (Tex.Crim.App.1981). In *Walker, supra* (1981), presiding Judge Onion, without dissent, held that the rule of law was clearly established that the accomplice witness need not be corroborated in all of his testimony and the corroboration need not directly link the accused to the crime, nor did the corroboration evidence need to be sufficient in and of itself to establish guilt. *Walker, supra,* (1981), is not controlling.

The dissent, which places major reliance on *Paulus, supra,* is not only unsound; but the reliance is misplaced. In *Paulus, supra,* in the opinion, starting on page 829, by Judge Clinton, the Court of Criminal Appeals wrote that all of the facts and circumstances in evidence may be looked to as furnishing corroboration and that the corroborative evidence may be circumstantial or direct or both. We recite this quote, from *Paulus, supra,* at page 846:

> "It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test...."

We quote further from the same case, at page 844:

> "Apparently insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of the accomplice witness' testimony. *Holmes v. State*, 70 Tex.Cr.R. 423, 157 S.W. 487 (1913).

Quoting further, at page 844, we find:

> " 'The law forbidding a conviction upon the uncorroborated testimony of an ac-

complice does not demand that there be direct evidence pointing to the accused as the offender, *but merely requires that there be "other evidence tending to connect the defendant with offense committed." * * * Circumstances proved by credible witnesses may be as potent as direct testimony in tending to connect the accused with the commission of the offense.* The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test. If by this rule it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense, the law is satisfied.'" (Emphasis added)

It has been held that it may be shown in corroboration, and as corroboration evidence, that the accomplice witness and the accused were close or intimate associates. Certainly the sexual activity engaged in here was an intimate association in view of the sexual assaults revealed in this record. Query: How intimate could the accomplice witness and the accused get in their actions? It should be remembered that the corroboration, here, did not merely go to show either a motive or an opportunity, but showed the actual commission of the criminal offense itself. It is both interesting and very significant to note that, after Judge Clinton's opinion in *Paulus, supra,* presiding Judge Onion wrote the opinion on the State's Motion for Rehearing, reaffirming Judge Clinton's opinion as to the corroboration issues.

The first *Walker* case, *Walker v. State,* 252 S.W. 554 (Tex.Crim.App.1923), is meaningfully different and distinguishable. There, the Court held that, in a court's charge or instruction on the corroboration required of an accomplice's testimony, the given instruction was held not sufficiently specific in requiring that the corroborating testimony must be such as tends to connect the accused with the offense. In *Walker,*

*supra,* (1923 case), the charge was susceptible of an erroneous construction by the jury simply because the jurors were at liberty to convict upon the testimony of the *accomplice alone if there were other facts sufficient to show that the accomplice, himself, was worthy of credit or belief.* That proposition of law simply does not fit the record before us in this appeal.

AFFIRMED.

BURGESS, Justice, dissenting.

While not crucial to the analysis of the case, the majority almost initially makes the following observation: "A startling episode took place in the trial. Apparently, the accused tried to influence or intimidate the accomplice witness Steve Thomas. The district judge and the jury observed this 'theatre in the round' or 'theatre in the pit' to use trial lawyer's jargon." This is the actual occurrence:

[THE COURT:] All right. Now, one point, Mr. Mumphrey, let this be on the record, you got a right to be here and watch this testimony. That's perfectly appropriate. But at one point I saw you shaking your head no when the witness was testifying.

MR. MUMPHREY: I wasn't shaking my head no.

THE COURT: I saw you shaking your head no. That may have meant that you personally disagreed with what he was saying. But I don't want you making any motions while he's testifying. I don't want you speaking out while he's testifying or making any kind of motions. In other words, I want you to be still while he's testifying. I don't want any distractions in the courtroom with regard to his testimony. You may not have been realized you were doing it. You're not in trouble with the Court or anything like that. I'm just suggesting and telling you that I want you to try to avoid that.

THE WITNESS: [Sic] I wasn't giving no head nods or nothing, because what he's saying, it ain't true, too much of nothing concerns me no way.

This melodramatic characterization epitomizes the way in which the majority analyzes this case. If the trial court thought appellant was trying to influence either the witness or the jury, why did the court state: "You're not in trouble with the court ..." rather than issuing a stern admonishment appropriate for acts of intimidation or influence?

The majority states the complainant herself gave enough testimony to corroborate the accomplice witness. I respectfully disagree. The victim's testimony corroborated that a senseless, degrading assault had been committed and the ancillary facts surrounding that assault. Her testimony does not, in any manner, tend to connect appellant with the offense committed. *See Reed v. State*, 744 S.W.2d 112 (Tex.Crim. App.1988).

The majority goes on to state: "Smith swore that Thomas proceeded to relate in detail, how he and the Appellant had had sex with the little girl. The appellant stood within four feet of the others and made no attempt to deny or refute that he had just engaged in committing the sexual assaults." The record reflects:

On direct examination:

Q And when you met up with them, are you sure that it was the defendant Merle Mumphrey instead of his brother Charles?

A Yes, sir. It was him and Steve.

Q It was him and Steve?

A Yes, sir.

Q What did ya'll talk about when you met up with them?

A He didn't do no talking. But Steve was talking, and he told me that they had got this little White girl. And you know they—I could tell that they had had something. And he told me that they gave her some, and she gave them some.

Q Slow down just a moment. You said that you could tell that they had had something. Are you talking about Steve Thomas and the defendant?

A Yes, sir.

Q That they had had something. Are you saying that they had had something to drink or something to smoke?

A Yes, sir, drink. Something that would kind of put you kind of like intoxicated.

Q So in other words, in your opinion you thought that the defendant Merle Mumphrey and Steve Thomas were intoxicated at the time that they were talking to you?

A Yes, sir. But Steve seemed, you know, more.

Q Steve was saying most?

A Uh-huh.

Q When Steve was talking to you, how far was Merle from you?

A He was—

Q Let me ask you this. Let me just walk toward you. And when I get as close as Merle was to you, you stop me, okay?

A Okay. Stop.

Q Would you say that that's something like four feet or so?

A Yes, sir.

Q So that's how close the defendant was to you—the defendant, Merle Mumphrey was to you when Steve was talking to you about what they had done that night; is that correct?

A Yes.

Q What did he say that they had done?

A He told me that they got this little White girl and they had given her some of the stuff and she just voluntarily gave them some.

Q Just voluntarily gave them some sex; is that correct?

A Yes, sir.

. . . .

Q And while they were telling you this, was Merle looking at you?

A No, sir.

Q But was he within about four feet of you; is that correct?

A Yes, sir.

Q And Steve, was he whispering this stuff to you?

A No, sir.

Q Just talking in regular conversation like we're talking now?

A Yes, sir.

Q You said you could tell that both of them were kind of messed up; is that right?

A He wasn't as messed up as Steve was. Seemed like Steve had had more. You know, just took control of him more than it had him.

Q You thought in your opinion Steve was more messed up than Merle was?

A Yes, sir.

Q Did Merle ever say, "No, no. I never did have any sex with this White girl"?

A No. He didn't say nothing.

Q Didn't say anything at all?

A No, sir.

. . . .

Q And, again, that Merle was standing about four feet away from Steve Thomas when Steve was telling you about getting some sex from this White girl; is that correct?

A Yes, sir.

Q Did they ask you if you wanted any?

A Steve did. I told him no.

Q Why did you tell him that?

A Because I didn't.

On cross-examination:

Q You didn't talk to Merle that night, did you?

A No, sir.

Q How close were you to Merle?

A About four feet.

Q How far would you say four feet is, about like this?

A A step or two up.

Q So to you that's about four feet?

A From here to the end of this thing right here.

Q To right here.

A Yes, sir. Oh, okay. If you want to put it like that then.

Q How far would you say it is, six or eight feet?

A From here to me, if you're going to step that big with it.

Q Six or eight feet?

A Yes, sir.

Q Did Merle acknowledge that he heard any of the conversation that night?

A I'm quite sure he did. He was standing close enough to hear it.

Q That's not answering my question. Did he acknowledge hearing any of that conversation that night?

A Tell me what you mean by that.

Q Well, all right. Did he say, "Yeah, we had a good time over there"? "Yeah, we didn't do it"?

A He didn't say nothing.

Q He didn't say anything, did he?

A He didn't say nothing.

The majority's characterization of this testimony as "in detail" and their conclusion that the accomplice's statements to the witness Smith equates to sexual assault is overreaching. According to the witness, the accomplice stated the sexual contact was voluntary. Admittedly the adjective "little" was used in describing the victim, but it can have a double meaning; small in stature or young. Consensual sexual contact with a small girl is not necessarily a penal offense. There is no evidence that the accomplice told the witness Smith anything about the victim's age or even if he knew the age of the victim.

The majority cites *Crestfield v. State,* 471 S.W.2d 50 (Tex.Crim.App.1971) for the general rule that when it is shown a defendant is not under arrest and a statement is made in his presence that he heard and understood and which called for a reply or a denial, then his silence may be shown as a confession. However, *Gamboa v. State,* 481 S.W.2d 423, 425–426 (Tex.Crim.App. 1972), discussed the rule and its application at some length. The court stated:

The State relies upon the rule that the silence of an accused to an accusation made in his presence is admissible against him provided he is not under arrest at the time.

In 1 Branch's Ann.P.C.2d Ed. sec. 87, p. 91, it is written:

"Before silence can be construed as a confession of the truth of a statement made in defendant's presence, it must be clearly shown that he heard

and understood the statement, and that it called for a reply...."

2 McCormick & Ray Texas Law of Evidence sec. 1152 (Admissions of a Party), p. 44 briefly states the rule as it exists in this state, as follows:

"... Where a statement is made in the presence of a party under such circumstances that he heard and understood what was said, had an opportunity to reply and would naturally have replied unless he admitted the truth of the statement his silence may be received as a tacit admission of its truth. The Texas courts are strict in the enforcement of these limitations. The offering party must affirmatively show that each of the requisite conditions existed...." [1]

24 Tex.Jur.2d Evidence sec. 626, p. 192, discussed the rule as follows:

"In criminal cases, if the accused fails to deny an incriminating accusation made to him or in his presence, the fact that he was silent is properly admissible against him as an admission of guilt. For such evidence to be admissible as an admission of guilt, however, *the statement made must have been an accusation of crime* that called for a denial or a reply. Moreover, the accused must actually have heard the statement and had an opportunity to deny it. And it is essential that the accused should not have been under arrest or in confinement at the time the statement was made." (Emphasis supplied.)

....

The rule in question has no application where the statement made in his presence is ambiguous or has a double meaning, *Welch v. State*, 46 Tex.Cr.R. 528, 81 S.W. 50, 52 ([Tex.Cr.App.] 1904), or is not an accusation of a crime or does not show some criminality. See *Crowell v. State*, 56 Tex.Cr.R. 480, 120 S.W. 897 ([Tex.Cr.App.] 1909); *Johnson v. State*, 107 Tex.Cr.R. 312, 296 S.W. 887 (1927).

....

Still further, if, from the circumstances, it appears that an accused is asleep, unconscious from intoxication, physically disabled from answering or physically suffering so as to probably be unable to understand any statement made, his silence signifies nothing and the statement is inadmissible. *O'Quinn v. State,* supra; *State v. Epstein*, 25 R.I. 131, 55 A. 204 (1903). In *Bloomer v. State*, 75 Ark. 297, 87 S.W. 438 (1905), the statement made in the accused's presence was excluded where the accused was drunk.

The evidence is far from clear whether or not appellant heard the accomplice's statements. The statements do not necessarily indicate any criminality, are ambiguous and could have a double meaning. Furthermore, the witness stated that appellant was intoxicated thus impairing his ability to understand or appreciate any inference of criminality. In this instance, his silence could not be used against him and thus cannot be corroboration of the accomplice testimony.

As a final piece of corroboration, the majority attempts to use the testimony of appellant's brother. They describe the brother's actions as "[a]n early stratagem engaged in ..." but do not point (and cannot) to any place in the record where appellant devised or participated in the attempt by the brother to "take the rap."

The focus of the appeal is not whether the jury had sufficient evidence before it to convict. They certainly did. Nor is this appeal concerned with the enhancement allegations or the punishment assessed. The question is whether the non-accomplice testimony is legal corroboration. Having addressed the majority's "silent confession" finding, I find no arguable corroboration. Under *TEX. CODE CRIM.PROC.ANN. art. 38.14* (Vernon 1979), the testimony alone of an accomplice witness cannot furnish the basis for a conviction, and a conviction so based *must* be reversed, *Walker v. State*,

---

**1.** In *O'Quinn v. State*, 55 Tex.Cr.R. 18, 115 S.W. 39 (1908), it was held that before the acquiescence of a defendant in the language or conduct of another can be assumed as the conces-sion of the truth of any particular statement, the facts must show beyond a reasonable doubt that the language was heard or the conduct understood by the defendant at the time.

94 Tex.Crim. 567, 252 S.W. 554 (1923). This is true no matter how complete a case may have been made by the accomplice witness testimony and no matter how much credit the jury may have given such testimony. *Paulus v. State,* 633 S.W.2d 827 (Tex.Crim.App.1981). Therefore, under the decisions of our highest criminal court, this court has no choice but to reverse the conviction and reform the judgment to reflect an acquittal. *Walker v. State,* 615 S.W.2d 728 (Tex.Crim.App.1981). Because the majority decides to the contrary, I respectfully dissent.