Opinion issued March 23, 2006












     



In The
Court of Appeals
For The
First District of Texas




NOS. 01-04-00955-CR
          01-04-00956-CR
          01-04-00957-CR
          01-04-00958-CR




DERWIN DALE LIVINGSTON, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 56th District Court
Galveston County, Texas
Trial Court Cause Nos. 03CR0084, 03CR0085, 03CR0086, 03CR0087




MEMORANDUM OPINION
          In two indictments, appellant was charged with sexual assault of a child. In
two other indictments, appellant was charged with the aggravated sexual assault of
a child. Each indictment contained an enhancement for one prior felony conviction. 
A jury found appellant guilty as charged in all four indictments, found each
enhancement paragraph “true,” and assessed punishment at confinement for life plus
a $10,000 fine on each charge. In two issues relating to the guilt–innocence portion
of the trial, appellant contends that (1) the trial court erred by admitting expert
testimony regarding odors when the witness was not properly qualified and (2) that
the evidence was factually insufficient to support the verdicts. In three issues relating
to the punishment portion of the trial, appellant contends that the trial court erred by
(3) admitting a judgment showing appellant’s prior conviction because it was not
properly authenticated, (4) permitting a witness to testify about the witness’s
participation in an extraneous offense, and (5) permitting a witness to testify about
appellant’s participation in an extraneous offense. We affirm.
BACKGROUND
          Appellant was charged with sexually assaulting his daughter, C.T., who was
14 years old at the time of trial. Michelle Parsons, a case worker for the Department
of Family Protective Services, testified that, on December 27, 2002, she initiated an
investigation involving the possible sexual abuse of C.T. Parsons went to the
Watergate Marina in League City because she had been told that C.T. was living on
a boat there with her father, appellant. Parsons determined that appellant had moved
his sailboat to the Portofino Marina in Clear Lake Shores, so she went there to
question C.T. Officer Nolan of the Kemah Police Department accompanied her to the
marina, and the two were soon joined by Chief Skelly of the Clear Lake Shores Police
Department. After she located appellant’s boat, Parsons knocked on it and heard
movement inside. C.T. opened the hatch and popped her head out. After Parsons
identified herself, C.T. went below to get dressed. Appellant then opened the hatch
and Parsons again identified herself and told appellant that she needed to speak to
C.T. Appellant then went below deck and C.T. came back out.
          Parsons testified that C.T. was shaking, had her head down, and kept looking
over at the boat toward appellant. Parsons testified that, at that time, C.T. denied the
sexual abuse allegations, but that she was definitely upset. 
          To determine the living conditions on the boat, Parsons asked appellant
whether she could go aboard, to which he responded affirmatively. Parson testified
that the interior of the boat was disheveled and not very clean. She testified that it
smelled “like cigarettes, stale beer, and like sweaty sex.” Parsons said that both C.T.
and appellant were “very malodorous.”
          Parsons asked appellant if she could look at his computer. After examining the
computer for a few moments, Parsons saw the “image of a young child, probably nine
years old, with no clothes on, in a river bed. Parsons showed the picture to Chief
Skelly, who then seized the computer.
          Parsons told appellant that C.T. would need to stay with someone else, and
appellant said that he would make arrangements to have C.T. stay with her adult half
sister, Heather O’Dell. Heather picked C.T. up from the police station and agreed to
have C.T. stay with her and for C.T. to have no contact with appellant.
          Heather testified that she and C.T. had the same mother, Rhonda, but that
appellant was C.T.’s father, not Heather’s. When Heather picked C.T. up from the
police station, C.T. was shaking and had been crying. She later admitted to Heather
that appellant had been sexually abusing her.
          Heather, accompanied by C.T. and their mother, Rhonda, left the police
department to take Rhonda back to appellant’s tattoo shop, where Rhonda lived. 
Appellant, who had been parked on a side road, pulled in behind them and followed
them to the tattoo shop. Appellant and Rhonda decided that Heather should take C.T.
to her grandparents’ house in Illinois. Appellant offered his car to Heather for the
trip. The next day, Heather and C.T. drove to Neoga, Illinois, where Rhonda’s
parents, Jack and Mary Turner, lived. Heather then left C.T. with the Turners and
returned to Texas.
          While in Illinois, C.T. talked to Parsons by telephone and told her that the
allegations of sexual abuse by appellant were true. C.T. underwent a physical
examination and gave a statement to police officers. After C.T.’s statement, Chief
Skelly obtained a search warrant for appellant’s boat, from which he retrieved two
sexual devices. Appellant was arrested soon thereafter.
          Another of appellant’s adult daughters, Dana Livingston, testified that, while
he was in jail, appellant wrote her lots of letters instructing her to do things to help
his case. Shortly after he was arrested, he asked Dana to remove a bag of sex toys
from his boat and get rid of it. Dana retrieved the bag, but turned it over to the police.
Appellant asked Dana to use C.T.’s email address and to send an email to herself,
purportedly from C.T., apologizing and saying that she had been lying about the
accusations. He also asked Dana to make anonymous calls to child protective
services in Illinois, saying that it would help his case if there were other allegations
of sexual abuse. 
          At trial, C.T. testified that, when she was 10 years old, appellant got drunk and
said that he “wanted to show how he kissed people his own age.” C.T. testified that
the inappropriate contact with appellant “started advancing,” first to “to sexual
contact and oral sex and intercourse.” C.T. testified that she was 12 years old when
she first had intercourse with appellant. She stated that at first it did not happen very
often because she was not physically mature, but that as she got older, it happened
more frequently. C.T. testified that after the first time, she had intercourse with
appellant “at least over 100 times.” C.T. testified that whenever she told appellant
that she did not want to have intercourse, he would tell her that he felt rejected and
that she did not love him. C.T. said that she would give in because she wanted to
prove that she loved him, “but that [she] didn’t want to do it in that way.”
          At trial, C.T. identified several nude photographs of herself that she claimed
appellant had taken. She also identified the sexual toys from the black bag that Dana
Livingston had recovered from appellant’s boat. C.T. testified that most of the sex
toys were used to “stretch her out” so that appellant could have sexual intercourse
with her.
          Dr. James Lukefahr, a physician at the ABC Clinic in Galveston, reviewed the
medical records from the exam done on C.T. in Illinois. In his opinion, C.T.’s
physical condition was consistent with her allegations of sexual assault by an adult
male. Due to the condition of C.T.’s hymen, Dr. Lukefahr concluded that C.T.’s
vagina had been penetrated at some point in the past by either an adult penis or some
object. It was highly unlikely that the damage had been done by a finger or tampon.
          Appellant, testifying in his own behalf, said that C.T. came to live with him
when she was in the fifth or sixth grade, and that he eventually decided that she
should be home schooled. He testified that C.T. would instigate CPS investigations 
“for entertainment purposes,” and that she could “cry on cue.” Appellant testified
about several prior CPS investigations—one allegedly involving allegations that
C.T.’s younger, mentally-retarded brother had molested her. Appellant also testified
about an incident between C.T. and a boy named Jason, which took place underneath
the bleachers at school. Another time, appellant claimed that CPS investigated
allegations of sexual abuse by a step-brother named Rusty when C.T. was six years
old. Appellant said that CPS came out to investigate allegations of the incident that
had “happened way back when,” and that she had brought these allegations about
Rusty up again just to get attention. Finally, he testified that CPS came out and
investigated allegations that another of his adult sons, Dale Derwin Livingston, had
inappropriately touched C.T. Appellant claimed that he was investigated because of
the similarily of the names, but that CPS later exonerated him and offered to remove
the records from their files, but that he told them not to because he wanted proof that 
C.T. needed psychiatric help. Appellant testified that, as a result of the allegation
against his son, he had C.T. examined in 2002, and that she was still a virgin at that
time. 
          Appellant denied taking the nude photographs of C.T. that were found on his
computer. In fact, he denied ever having seen them before. He testified that his
whole family had access to the computer. He also testified that the photograph of the
nude girl in the stream was not C.T., but was an 18-20 year old picture of Heather.
          On rebuttal, the State called Kimberly Moore, a bartender at Legends Billiards. 
Moore testified that appellant would often bring C.T. to the pool hall while Moore
was working there. On one occasion, appellant went out to the car to get his laptop
computer so that he could show Moore some family photographs. While scrolling
through the photographs, Moore saw nude photographs of C.T. on a couch and in the
bathroom.
          At the punishment phase of the trial, Heather testified that appellant began
having oral sex with her when she was nine years old, and that he began having
intercourse with her when she was 10 years old. Heather testified that this occurred
“countless” times until she moved to Illinois with her mother when she was 12 years
old. She also testified that, when she was 10 years old, she, her mother, and appellant
manufactured crystal methamphetamine in a trailer in Kansas, Illinois. She testified
that she would help set up the lab, the beakers, the test tubes, and that she would stir
up the chemicals until they got hard.
          On rebuttal, appellant acknowledged that Heather’s mother, Rhonda,
manufactured crystal methamphetamine, but he denied participating in the venture. 
He also testified that Heather blamed him for her husband’s arrest and that she had
told him that she would get even with him. He also introduced evidence that Heather
gained financially as a result of his arrest because she was left to run his tattoo shops. 
                                       GUILT–INNOCENCE ISSUES
Admission of Testimony Regarding Odors
          In issue one, appellant contends the trial court erred by permitting Michelle
Parsons to testify that, when she went to the boat to talk to C.T., it smelled “like
cigarettes, stale beer, and like sweaty sex.” Specifically, appellant claims that
Parsons did not lay the proper predicate to qualify her as an expert in the area of
“smell identification.”
          The admissibility of evidence is within the discretion of the trial court and will
not be reversed absent an abuse of discretion. Powell v. State, 63 S.W.3d 435, 438
(Tex. Crim. App. 2001). If there is evidence supporting the trial court’s decision to
admit evidence, there is no abuse and the appellate court must defer to that decision. 
Id.
          In Osbourn v. State, 92 S.W. 3d 531, 537 (Tex. Crim. App. 2002), the Court
of Criminal Appeals discussed the circumstances under which a lay witness could
testify about the odor of marihuana.
It does not take an expert to identify the smell of marihuana smoke. 
Testimony as to the identity of an odor is admissible in some instances
even though the person testifying is not an expert. Chess v. State, 357
S.W.2d 386, 387-388 (1962). While smelling the odor of marihuana
smoke may not be an event normally encountered in daily life, it
requires limited, if any, expertise to identify. See e.g., Kemner v. State,
589 S.W.2d 403 (Tex. Crim. App. 1979) (airline employee recognized
odor of marihuana emanating from appellant's suitcase and informed
DEA); Chaires v. State, 480 S.W.2d 196 (Tex. Crim. App. 1972)
(airline baggage agent smelled odor of marihuana in appellant’s
suitcase, opened the suitcase and identified the grassy substance it
contained as marihuana); Hattersley v. State, 487 S.W.2d 354 (Tex.
Crim. App. 1972) (airline employee determined by sight and smell that
appellant’s suitcase contained marihuana); Sorensen v. State, 478
S.W.2d 532 (Tex. Crim. App. 1972) (appellant’s mother testified that
she recognized the odor of marihuana when she found it in her son’s
room); Mumphrey v. State, 774 S.W.2d 75 (Tex. App.—Beaumont 1989,
pet. ref’d) (13-year-old rape victim testified that she smelled the odor of
marihuana on the clothes of appellant). Although it cannot be presumed
that everyone is capable of identifying marihuana by smell, a witness
who is familiar with the odor of marihuana smoke through past
experiences can testify as a lay witness that he or she was able to
recognize the odor.

Id.
          Similarly, here, the trial court did not abuse its discretion in concluding that
expert testimony was not required before permitting Parsons to testify about her
perception of the odors she smelled on appellant’s boat. We overrule issue one.
Factual Sufficiency
          In issue three, appellant contends the evidence is factually insufficient to
convict him. Specifically, appellant points out that (1) there were no scientific or
DNA tests performed on the sexual devices removed from his boat; (2) C.T. gave
testimony about the date of the initial sexual penetration by appellant that conflicted
with appellant’s testimony that she was still a virgin at that time; (3) CPS had
conducted prior investigations for possible sexual abuse of C.T., but no arrests had
been made; (4) C.T. did not know that appellant had a pierced penis until a prior trial
that ended in a mistrial; and (5) Heather O’Dell was biased against appellantbecause
she held him responsible for having her husband put in jail.
          In a factual-sufficiency review, we view all the evidence in a neutral light, and
we will set aside the verdict only if the contrary evidence is so strong that the verdict
is clearly wrong and manifestly unjust or the evidence is so weak that the standard of
proof of beyond a reasonable doubt could not have been met. Zuniga v. State, 144
S.W.3d 477, 483 (Tex. Crim. App. 2004). We review the evidence that tends to prove
the existence of the elemental fact in dispute and compare it with the evidence that
tends to disprove that fact. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996). However, we must avoid substituting our judgment for that of the fact finder.
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). The fact finder is the sole
judge of the weight and credibility of witness testimony and may accept or reject any
alternative theory of causation. Zuniga, 144 S.W.3d at 483; Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986). We must defer appropriately to the fact
finder to avoid substituting our judgment for its judgment. Zuniga, 144 S.W.3d at
481-82.
          Although the State did not perform any scientific tests on the sexual devices
that were removed from appellant’s boat, the jury could have chosen to believe C.S.
when she identified the devices and stated that appellant had used them on her. 
Furthermore, the jury could have believed that by directing Dana Livingston to
remove the devices from the boat and to “get rid of them,” appellant evidenced his
ownership and possession of the devices, and that no further scientific evidence was
necessary to link them to appellant.
          Likewise, the jury heard and was permitted to resolve any differences in C.T.’s
testimony about the date of the initial penetration. Put simply, the jury could have
believed C.T. but decided that she was confused about the dates. The jury could also
have simply disbelieved appellant’s testimony that he had C.T. examined in 2002 and
that she was still a virgin at that time.
          Regarding the evidence of appellant’s pierced penis, C.T. testified that she did
not mention it at the previous trial because no one asked her about it. The jury could
have accepted this explanation about C.T.’s failure to mention this distinguishing
feature until appellant’s second trial.
          Finally, the jury, as sole judge of the weight and credibility of the witnesses,
was entitled to believe Heather O’Dell and to disbelieve appellant.
          Accordingly, we hold that the evidence is factually sufficient and overrule issue
three.
PUNISHMENT ISSUES
Admission of Judgment Reflecting Prior Felony Conviction
          In issue two, appellant contends that the trial court erred at the punishment
phase of the trial by permitting the State to introduce his prior felony conviction,
which he claims was not properly authenticated. Specifically, appellant argues that
“[a]lthough certified copies of the judgment and sentence are admissible supporting
evidence, they are not normally sufficient by themselves to connect the defendant
with the prior conviction.” Therefore, we understand appellant’s point of error to be
not a challenge to the authentication of the judgment, but to the sufficiency of the
evidence to link that judgment to him.
          The State may introduce authenticated copies of state prison records and
certified copies of a judgment and sentence to show that a defendant committed
another crime. Beck v. State, 719 S.W.2d 205, 210 (Tex. Crim. App. 1986). 
However, these are not enough evidence on their own. Id. The State must come
forward with evidence to prove the defendant is the person described in those
docments. Id. Typically, this link is established by having a fingerprint expert match
the fingerprint on the records with a fingerprint taken from the defendant. Id. 
However, there is no exclusive method for linking the defendant to the prior
judgment. Id. The supporting evidence may come from evidence introduced during
either the guilt-innocence or punishment phase of the trial. Griffin v. State, 181
S.W.3d 818, 820 (Tex. App.—Houston [14th Dist.] 2005, no pet.).
          At the punishment phase of trial, the State introduced a certified copy of an
Illinois judgment and sentence, with the indictment upon which the judgment was
based. The indictment showed that one Derwin Dale Livingston, along with Richard
L. Walker and Marvin James Abernathy, was charged with aiding and abetting Dale
Cruse in the planning and commission of a burglary offense, which was committed
in December 1967. The judgment shows that Derwin Dale Livingston pleaded guilty
to the charges in the indictment in 1968 and was placed on three years’ probation,
which was revoked in 1970.
          During the guilt-innocence phase of the trial, appellant testified about his prior
conviction as follows:
Q: You ever had prior dealings with the law?
 
A: In 1967, I think over 35 years ago, I was arrested for burglary. I was
convicted for accessory to the fact, after the fact.
 
Q: What was your sentence, sir?
 
A: I was given probation for that, three years probation.

          Also during the guilt-innocence phase of the trial, the following discussion
with defendant of State’s Exhibit 38—the Illinois Judgment and Sentence and
accompanying indictment—took place:
Q: You had testified earlier about a conviction you had. Do you
remember that?
 
A: I have more than one condition.
 
Q: Conviction?
 
A. You mentioned one a minute ago. I don’t know if I mentioned it to
you or not.
 
Q: Criminal conviction.
 
A. 1967.
 
Q. Right.
 
A. In 1967 I give [sic] a man a lift. His name was Jim Abernathy.
 
Q. That was out of the State of Illinois?
 
A. He had robbed a place, yes.
 
Q. Out of the State of Illinois?
 
* * * * 
 
Q. Is that the conviction you are talking about?
 
A. The conviction I was talking about was reflected on a piece of paper
you showed my attorney as evidence.
 
The Court: Mr. Livingston, just answer the question directly.
 
A. No, it’s not.
 
Q. That’s fine.
 
A. The date is wrong. It doesn’t correspond with the one you gave us
as evidence. This says 1970. Ours—
 
The Court: Mr. Livingston, you need to wait for the next question.
 
A. Okay. I am sorry.
 
Q: Go ahead. Look on the second page of 38, I think is the date you
were looking for.
 
A. The date that I got that from was a piece of paper, yes. This does say
1967.
 
Q. That’s the judgment you are talking about?
A. That’s what you are talking about. I would like to forget about it.
Q. But that’s long gone? That’s the one?
A. It’s the only felony that I know of I have a past record with. It’s the
only one of the rap sheet you provided us with.
 
Q. That’s the same; correct?
A. I think so. I would rather my attorney look at that instead of me. 
          Appellant admitted to a 1967 arrest in Illinois for burglary as an accessory, for
which he received three years’ probation. He further testified that he was arrested
when giving a man named Jim Abernathy a ride. The Illinois judgment/sentence and
accompanying indictments show that Derwin Dale Livingston was arrested, along
with a man named Marvin James Abernathy, in December 1967, that he was indicted
for aiding and abetting a robber, that he pleaded guilty and was placed on probation,
which was later revoked. The Illinois judgment/sentence also indicated that Derwin
Dale Livingston was 27 years old in 1970. Appellant testified that he was 61 years
old at the time of trial in 2004. Therefore, the age of the Derwin Dale Livingston in
the judgment/sentence matches the age that appellant would have been in 1970.
          Based on this information, much of which appellant provided through his own
testimony, the jury had sufficient evidence to conclude that appellant was, in fact, the
same Derwin Dale Livingston named in the Illinois judgment/sentence. See Beck,
719 S.W.2d at 210 (stating that “the necessary proof [to link a defendant to a certified
judgment] may come from the introduction of the pen packet and the testimony of the
defendant.”). 
          Accordingly, we overrule issue two. 
Admission of Extraneous Offense Testimony
          At the punishment phase of the trial, Heather O’Dell testified that appellant,
herself, and her mother operated a crystal methamphetamine laboratory when Heather
was 10 years old. In issue four, appellant contends that the trial court erred in
admitting the testimony because such evidence was inadmissible character evidence
under Rule 404 of the Texas Rules of Evidence. In issue five, appellant contends that
such evidence was improper victim impact evidence by someone other than the
complainant named in the indictment.
          To preserve error for appellate review, a defendant must make a specific
objection in the trial court. Wilson v. State, 71 S.W.3d 346, 349 (Tex. Crim. App.
2002); Tex. R. App P. 33.1(a)(1)(A). The point of error on appeal must comport with
the specific objection made at trial. Wilson, 71 S.W.3d at 349. An objection stating
one legal basis may not be used to support a different legal theory on appeal. Rezac
v. State, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990).
          When the State offered Heather’s testimony about the manufacture of crystal
methamphetamine, no objection was made upon either of the grounds urged on
appeal. Before Heather testified, appellant took her on voir dire to determine whether
she had first-hand knowledge of the substances created in the lab. He later objected
that Heather’s testimony should not be admitted because she was not “shown to be
a scientist or chemist.” Because appellant’s objections at trial do not comport with
the issues raised on appeal, points of error four and five are waived. Furthermore, the
State may offer evidence of extraneous offenses during the punishment phase of the
trial. See Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1). 
          We overrule issues four and five.
 
CONCLUSION
          We affirm the judgments.
 
 
 
                                                                        Sherry Radack
                                                                        Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Alcala.

Do not publish. Tex. R. App. P. 47.2(b).